Sara L. CRAWFORD, Special Administrator of the Estate of Scott W. Pawlisa, Deceased, and Brian Pawlisa, Deceased, as Administrator, Plaintiff-Appellant,

v.

Jerry EDMONSON, Individually and as a Police Officer of the City of Centralia; Kermit Justice, Individually and as Chief of Police of the City of Centralia, and the City of Centralia, a municipal corporation, Defendants-Appellees.

No. 84–2371.

United States Court of Appeals, Seventh Circuit.

Argued April 12, 1985.

Decided June 13, 1985.

Philip B. Alfeld, East Alton, Ill., for plaintiff-appellant.

Charles Schmidt, Mitchell, Brandon & Schmidt, Carbondale, Ill., for defendants-appellees.

Before CUMMINGS, Chief Judge, and POSNER and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Plaintiff-appellant Sara Crawford appeals from the district court's denial of her motion for a new trial following a jury verdict in favor of defendants-appellees on the section 1983 claim that she brought as Special Administrator of the estates of her two deceased sons, Brian and Scott Pawlisa. Her suit alleged that the defendants violated the civil rights of Brian and Scott Pawlisa when defendant Jerry Edmonson, a police officer for the city of Centralia, shot and killed the two boys as they fled the scene of an armed robbery.

The issues on appeal are (1) whether the trial court abused its discretion in admitting evidence of Brian and Scott Pawlisa's prior misconduct involving the use of guns for the purpose of demonstrating Captain Edmonson's reasonable perception that the boys posed a threat to him and his fellow officers, (2) whether the trial court abused its discretion in allowing the testimony of Cheryl Sprehe, an employee of the store that was robbed, and (3) whether the trial court erred in denying plaintiff's motion for a directed verdict on liability in the shooting of Scott Pawlisa. We find no error on the part of the trial court and accordingly affirm the court's entry of judgment on the jury verdict.

## I.

On the night of Friday, December 21, 1979, Brian and Scott Pawlisa robbed a Long John Silver's restaurant in Centralia, Illinois. The Centralia police had staked out the restaurant that night, acting on a tip from the police chief of a neighboring community that the Long John Silver's would be robbed either Friday or Saturday night, that one of the restaurant employees would aid the robbery attempt, that it would be an armed robbery, and that one or both of the Pawlisas would be involved. The five officers participating in the stakeout (defendants Edmonson and Justice, Detectives Simer and Shaw, and Captain Qualls) had positioned themselves around the restaurant by approximately 9:15 p.m.

Between 9:30 and 10:00 p.m., the officers observed a white Chevy slowly circling the Long John Silver's. Detective Simer, who had a pair of binoculars that evening, testified that he recognized one of the car's occupants as Brian Pawlisa and informed the other officers of that fact by police radio. Shortly after 10:00 p.m., two individuals were seen leaving the car immediately behind the Long John Silver's, running across an open field, and hiding underneath a trailer in a private yard. Detective Simer testified that he identified Brian Pawlisa as one of the boys getting out of the car, and believed that he so stated over the police radio. Although Captain Edmonson testified that he was not able to identify the two suspects himself, he later testified that he knew based on Simer's identification that one of the two suspects was Brian Pawlisa.

After the boys ran and hid under the trailer, they were under constant surveillance for the next fifty or so minutes. During that time, an employee emerged from the restaurant to take out the trash and talked to the suspects across the field for a few minutes. The suspects then ran from the trailer to a shed behind the Long John Silver's. Soon thereafter, the same employee came out to the shed to speak with them again. Up to this point, no gun had been conclusively identified and all officers agreed that they had no probable cause to make an arrest. The suspects then emerged from the shed with masks over their faces. One was seen carrying a gun. Although probable cause was finally established at that point, the officers testified that they did not have enough time to get themselves in position to make a safe arrest before the suspects ran along the west side of the building and entered the Long John Silver's through the front door.

After the two suspects entered the Long John Silver's, Captain Edmonson and Detectives Simer and Shaw took positions around the back of the restaurant. The officers were partially hidden behind cars,

a garbage bin, the shed, and a telephone pole. Captain Qualls took a position in front and to the side of the restaurant in the adjacent open field near a "For Sale" sign.[1] All four officers were armed with their service revolvers and 12-gauge shotguns.

When the two suspects emerged from the rear door of the restaurant a few minutes later, one carrying a gun, they immediately started running toward the open field. Simer, Edmonson, and Shaw all testified that they shouted "Halt, police," at least three times before any shots were fired. Edmonson then fired a shot into the air, but the boys continued running. By this time Captain Qualls could see them running from behind the building and he too shouted "Halt, police." The officers testified that the first suspect, the one with the gun, then started to turn to his left toward Detective Shaw's position behind the telephone pole. Edmonson then fired two shots, both aimed at the figure in front with the gun (later identified as Brian Pawlisa). Edmonson's first shot struck both boys, and the second hit only Brian. Scott Pawlisa, who was 18 years old, was hit in the back by five pellets of 00-buckshot and died within an hour. Brian, who was 17 years old, was struck by six pellets in his back and died of his wounds some twenty hours later. All four officers testified that when Edmonson fired the fatal shots, they were in fear for their lives. Detective Shaw had already attempted to fire, but his gun was apparently not loaded. Detective Simer and Captain Qualls both testified that they were about to fire and would have if Edmonson had not.

The deceased boys' mother, plaintiff-appellant Crawford, filed this action as their special administrator in December 1981, alleging a violation of her sons' civil rights under 42 U.S.C. § 1983 (1982) and seeking recovery under the Illinois Wrongful Death

and Survival Acts for the defendants' negligence. The case was tried in November 1983 but ended in a hung jury, 5–1 in the defendants' favor. When the case was retried in June of 1984, Crawford dropped the negligence claims and proceeded solely on the section 1983 claim. The defense argued, as it had in the first trial, that Captain Edmonson shot Brian and Scott Pawlisa in good faith and with legal justification based upon the Illinois deadly force statute, which provides that a police officer may use force likely to cause death or great bodily harm

> only when he reasonably believes that such force is necessary to prevent death or great bodily harm to himself or [another] person, or when he reasonably believes both that:
>
> (1) Such force is necessary to prevent the arrest from being defeated by resistance or escape; and
>
> (2) The person to be arrested has committed or attempted a forcible felony or is attempting to escape by use of a deadly weapon, or otherwise indicates that he will endanger human life or inflict great bodily harm unless arrested without delay.

Ill.Rev.Stat. ch. 38, § 7–5(a) (1983).[2] A copy of this statute was posted on the bulletin board in the Centralia police station, and was known to Captain Edmonson at the time of the shooting. The jury in the second trial deliberated for forty minutes before returning a verdict for the defendants. The trial court subsequently denied Crawford's motion for a new trial and entered final judgment on the verdict. This appeal followed.

## II.

### A. Admission of Evidence of Prior Misconduct

Crawford argues that the trial court erred in allowing the admission of evidence

---

**1.** Chief of Police Kermit Justice had left the scene to follow the white Chevy.

**2.** Under *Tennessee v. Garner*, —— U.S. ——, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), in which the Supreme Court held that Tennessee's deadly force statute was unconstitutional insofar as it authorized the use of deadly force in that case,

*id.* at 1701, the Illinois statute seems to pass constitutional muster. *See id.* at 1704 & n. 18 (listing Illinois as one of 18 states allowing the use of deadly force only in circumstances deemed appropriate at page 1701 of the Court's opinion).

of Brian and Scott Pawlisa's prior involvement in three incidents involving the use of guns. She argues that the evidence was of no probative value, was unfairly prejudicial to her case, and served only to put the boys on trial posthumously for their past crimes. The defendants maintain that the contested evidence was relevant to Captain Edmonson's reasonable belief, at the time he pulled the trigger, that deadly force was necessary to prevent death or serious injury to himself or the other officers. They further argue that the evidence was not unduly prejudicial when compared to the boys' admitted armed robbery of the Long John Silver's that very night.

Prior to trial, Crawford filed a motion *in limine* to preclude the defendants from making any mention of Brian or Scott Pawlisa's prior juvenile and/or criminal records or of their supposed involvement in the armed robbery of a Hardee's restaurant three months before their death. The trial judge ruled that testimony on the Hardee's incident would be allowed as well as testimony about two other specific acts of misconduct involving guns. He disallowed any mention of prior acts of misconduct that did not involve the use of guns.

The first incident described to the jury was a cross-burning with which the boys were involved in May 1979. The incident was investigated by Lieutenant Upchurch, Centralia's juvenile officer, who reported directly to Captain Edmonson. Edmonson testified that the Pawlisas and some of their friends had built a cross, wrapped it with some rags, doused it with a flammable liquid, put it on a street corner in a predominately black community in Centralia, and set it afire. One of the boys who had allegedly participated in the cross-burning told the police that a .44 Magnum pistol had been obtained from the Pawlisas' father and had been shot into the air six times during the cross-burning. He also said that the boys had gone back to a house in the white part of town to lie in wait with guns for the blacks to come and retaliate. Although Brian Pawlisa was charged with disorderly conduct as a result of the incident, no weapons charges were filed

against any of the boys involved. Crawford asserts that since no weapons charges were filed, no shots were ever fired. She therefore argues that the cross-burning incident, which her brief quite inappropriately describes as "little more than a juvenile prank," had no probative value as to the reasonableness of Edmonson's belief over six months later that the Pawlisas would be likely to use a gun against him or the other officers.

The second incident referred to at trial was the accidental shooting of Jimmy Collins, a friend of Brian and Scott Pawlisa's. Edmonson testified that several boys, including the Pawlisas, were playing around with a gun when it went off and shot Collins in the leg. Edmonson further testified, however, that it was Jimmy Collins who was holding the gun when it went off, and that the Pawlisas were merely present when the accident occurred. There was no evidence that the gun belonged to either of the Pawlisas.

The third incident related to the jury was the armed robbery of a Hardee's restaurant in Centralia on September 28, 1979. Captain Edmonson was one of the two officers investigating that robbery. He testified that a shot had been fired inside the building in the course of the robbery, that the robbers had told the employees that they would blow their heads off, and that they had pushed one of the employees around. Edmonson further testified that the Pawlisas had been suspects in that robbery based on information received the day after the robbery from Mr. Richard Rich, the Dean of Students at Centralia High School. Rich had previously given information to the police department on numerous occasions, and was considered a reliable source. Rich informed Edmonson and Detective Simer, during an interview in Rich's office, that some students had told him that Brian Pawlisa's girlfriend had been bragging around school about her boyfriend's involvement in the Hardee's robbery the night before. The notes that Edmonson made at Rich's office that day bore the names of five persons, including

Brian and Scott Pawlisa. Next to each of the Pawlisas' names was the notation "gun." Edmonson's investigation into the Hardee's robbery did not result in any charges being brought against the Pawlisas or anyone else prior to the boys' death nearly three months later.

The scope of our review of evidentiary questions such as those presented in this case is extremely narrow. The Federal Rules of Evidence allow the admission of any relevant evidence except as otherwise provided by the Constitution, Acts of Congress, or the Rules. Fed.R.Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R. Evid. 401. Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice...." Fed.R.Evid. 403. Since most evidence presented by one party in litigation will presumably be prejudicial to the other, in the sense that it favors the party introducing it and damages the opposing party's case, Rule 403 requires that the evidence sought to be excluded threaten *unfair* prejudice. *United States v. Medina*, 755 F.2d 1269, 1274 (7th Cir.1985); *Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir.1980). Unfair prejudice is the "likelihood that the evidence will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented on the crime charged...." *Medina*, 755 F.2d at 1274. *See also* Fed.R.Evid. 403 advisory committee note. In this case, for example, the contested evidence would cause unfair prejudice to Crawford if it induced the jury to decide for the defendants because the Pawlisas were bad boys who deserved what they got rather than upon a determination that Edmonson was legally justified in shooting them.

Once it is determined that evidence has probative value but creates a danger of unfair prejudice, the trial judge must find that the danger of undue prejudice *substantially* outweighs the probative value of the evidence before its exclusion will be warranted under Rule 403. *Medina*, 755 F.2d at 1274. The trial court's balancing of unfair prejudice and probative value is completely within its discretion, and its decision on admissibility must be accorded "great deference." *Id.*

The trial judge in this case decided before trial to allow testimony on the three specific incidents described above. In so doing, the court determined that the danger of unfair prejudice from this testimony did not substantially outweigh its probative value. Because the relevant issue was whether Captain Edmonson reasonably believed that the Pawlisas would use the gun that Brian was carrying as they ran out of the Long John Silver's against Edmonson or his fellow officers, the trial court excluded any reference to prior misconduct of the boys that did not involve the use of guns.

Crawford correctly observes that Captain Edmonson's testimony on these three incidents was not the best evidence of whether they actually occurred, since his was often second- or third-hand knowledge of the incidents in question. Yet the issue was not whether the incidents actually occurred, but rather the extent of Edmonson's knowledge of those incidents at the time he shot the Pawlisas. Thus, it would not have been proper for Lieutenant Upchurch, whose state of mind was not at issue, to testify about the cross-burning even though he had more complete knowledge of the incident from his direct investigation. Instead, Captain Edmonson testified as to his *own* knowledge of the incident, based largely on Lieutenant Upchurch's reports. Only the latter testimony had any probative value concerning the issue before the jury, and only the latter was put into evidence. The jury was capable of weighing the hearsay quality of Edmonson's information when determining whether it was reasonable for him to believe, on the basis of that information, that the Pawlisas would be likely to use the gun that Brian was carrying that night.

■ Beginning with the probative value of the three incidents reported, we agree with the trial court that both the cross-burning incident (at which Edmonson could reasonably have believed shots were fired) and the Hardee's armed robbery had probative value regarding Edmonson's belief that the Pawlisas could and would fire at the officers stationed outside the Long John Silver's.[3] The accident involving Jimmy Collins, however, had little or no probative value on that issue because Edmonson knew that Collins had shot himself and that the Pawlisas were only standing nearby. The accidental shooting therefore had little or no bearing on the likelihood that the Pawlisas would themselves fire a weapon.

■ Turning to the danger of unfair prejudice, it seems clear that the testimony on the cross-burning and the armed robbery of the Hardee's created the possibility that the jury would decide the case on improper grounds. The danger of undue prejudice stemming from these two incidents must be viewed, however, in light of the undisputed evidence that the Pawlisas had robbed the Long John Silver's at gunpoint that very evening. We believe that a jury would not find the two prior acts of misconduct more morally reprehensible than the Long John Silver's robbery, nor would it find the number of incidents involved unduly suggestive of a two-person "crime wave" justifiably brought to an end. With regard to Jimmy Collins's accidental shooting, although we have said that the incident had little or no probative value, we also believe that it caused little or no danger of unfair prejudice. The Pawlisas' mere presence when Collins accidentally shot himself was just not the sort of "misconduct" likely to induce the jury to decide that the boys "deserved" what they got. Although, in such circumstances, we would have preferred to see the evidence excluded, we cannot say that the trial court abused its considerable discretion in admitting it.

All things considered, we believe that the trial court did not abuse its discretion in determining that the probative value of these prior acts of misconduct was not substantially outweighed by the danger of unfair prejudice. We therefore affirm the trial court's admission of the evidence.

## B. Admission of Testimony of Cheryl Sprehe

■ Crawford next contends that the trial court abused its discretion by denying her pre-trial motion to exclude the testimony of Cheryl Sprehe, who was the crew leader of the Long John Silver's restaurant on the night of the robbery. Sprehe was permitted to testify as to some of the circumstances of the robbery itself, even though they were not in dispute, in order to corroborate Edmonson's perception of fear at the time he shot the boys. Crawford alleges that the prejudicial effect of Sprehe's testimony substantially outweighed its probative value.

Crawford's allegation in her pre-trial motion that Sprehe's testimony would be unfairly prejudicial was based primarily on Sprehe's conduct during the first trial. In that proceeding, Sprehe "literally came unglued on the witness stand," in the words of the trial court, began crying, and gave a very graphic description of what had happened to her that night. She testified that she was seven or eight months pregnant at the time of the robbery, that she was terrorized by the two men, and that they had held a gun to her head, had made her get down on the floor, and had taped her hands and feet with duct tape. Although the trial

---

**3.** Crawford argues that evidence of the Pawlisas' prior misconduct had absolutely no probative value because Captain Edmonson did not know that the two boys running out of the Long John Silver's were the Pawlisas. Edmonson testified several times at trial that he did not know at whom he was firing. Other testimony indicates, however, that he knew that one of the boys had been identified as Brian Pawlisa but just did not know which one was Brian at the time they ran out of the restaurant, at night, with their masks on. We hold that the question whether Edmonson reasonably believed at the time he fired that one of the suspects was Brian Pawlisa was a factual question, and that there was sufficient evidence to support the jury's conclusion that he did.

judge denied Crawford's motion to exclude Sprehe from testifying altogether in the second trial, he made every attempt to ensure that Sprehe's emotional performance in the first trial would not be repeated. The judge ruled before trial that testimony as to her pregnancy, being put on the floor, having a gun held to her head, and being taped would *not* be allowed in the second trial. The court further instructed defendants' counsel as follows:

> I want you to caution this young woman very carefully about the limits that I have placed on her testimony. Hopefully she has been through this once and she will be a little more composed this time, but I want you to caution her about that too.

Tr. 9. Cheryl Sprehe's testimony in the second trial lasted only a few minutes. She testified that two men came in wearing stocking masks, that they pointed a gun at her, and that they asked for all of the money. She further testified, by "yes" or "no" answers to counsel's questions, that she believed it was a real robbery, that she believed the two men were serious, and that she was in fear for her life. At no time during her brief testimony did she break down or cry.

We hold that the trial court did not abuse its discretion in allowing Cheryl Sprehe to testify. The trial judge acted within his discretion in deciding that any unfair prejudice due to Sprehe's testimony, which was largely deflected by the trial judge's careful instructions to counsel prior to trial, did not so substantially outweigh the probative corroborative value of her testimony as to justify its exclusion.

### C. Directed Verdict as to Scott Pawlisa

Crawford lastly argues that the trial court erred in denying her motion for a directed verdict against Captain Edmonson on the issue of liability in the shooting of Scott Pawlisa. She asserts that Edmonson negligently deprived Scott of his constitutional rights by accidentally shooting him while attempting to shoot Brian. Edmonson admitted at trial that he was only aiming at Brian Pawlisa, who was carrying the gun, and did not intend to shoot Scott Pawlisa, who was unarmed.

■ The underlying premise of Crawford's negligent deprivation claim is that simple negligence is generally sufficient to establish liability under section 1983. This is not, however, entirely true. The Supreme Court held in *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), that a plaintiff must establish two essential elements in order to recover under section 1983: (1) that the defendant acted under color of state law, and (2) that the defendant's conduct "deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Id.* at 535, 101 S.Ct. at 1913. If these two elements are established, section 1983 allows recovery even if the defendant's conduct was merely negligent rather than intentional. *Id.* at 534–35, 101 S.Ct. at 1912–13. *Parratt* therefore stands for the proposition that section 1983 imposes no independent state of mind requirement, and thus that simple negligence *may* be sufficient to establish liability under section 1983. Whether negligent conduct will sustain section 1983 liability in a given case depends upon the particular constitutional provision at issue. *See id.* at 547–48, 101 S.Ct. at 1919 (Powell, J., concurring) (question of whether intent is necessary to establish liability cannot be given uniform answer across broad spectrum of constitutional violations); *Baker v. McCollan,* 443 U.S. 137, 140 n. 1, 99 S.Ct. 2689, 2692 n. 1, 61 L.Ed.2d 443 (1979) (apart from the issue of whether section 1983 contains its own state of mind requirement, the defendant's state of mind may be relevant on the issue of whether a constitutional violation has occurred in the first place). *See also State Bank of St. Charles v. Camic,* 712 F.2d 1140, 1146 (7th Cir.) (even though section 1983 embodies no state of mind requirement, the Eighth Amendment does), *cert. denied,* — U.S. —, 104 S.Ct. 491, 78 L.Ed.2d 686 (1983). For example, Crawford's complaint alleged violations of her sons' First, Fourth, Fifth, Eighth, and

Fourteenth Amendment (including due process and equal protection) rights. Yet negligence would not be sufficient, even if proven, to establish a violation under either the Eighth Amendment, *see Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976) (requiring "deliberate indifference"); *State Bank of St. Charles v. Camic*, 712 F.2d at 1145–46 ("deliberate or callous indifference"), or the Equal Protection Clause of the Fourteenth Amendment, *see Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977) (requiring discriminatory intent or purpose). Thus, simple negligence will not in every instance suffice to establish a constitutional violation under section 1983.

Because negligent conduct is the absolute minimum that must be shown to establish a violation of any constitutional right, however, we would not reach the question of whether negligence would be sufficient to maintain section 1983 liability in this case if the jury properly found that Edmonson was not negligent in shooting Scott Pawlisa. Crawford's only argument on appeal is that the trial court erred in submitting the issue to the jury in the first place.

Our standard for reviewing the trial court's denial of Crawford's motion for a directed verdict on this issue is whether, viewing all of the evidence in the light most favorable to the defendants, there was sufficient evidence to warrant submitting to the jury the question whether Edmonson acted as a reasonably careful person would have acted under similar circumstances when he shot Scott Pawlisa. *See Hannigan v. Sears, Roebuck & Co.*, 410 F.2d 285, 287–88 (7th Cir.), *cert. denied*, 396 U.S. 902, 90 S.Ct. 214, 24 L.Ed.2d 17 (1969); 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2524 (1971). The mere fact that Captain Edmonson did not intend to shoot Scott Pawlisa does not conclusively establish that he acted unreasonably or negligently under the circumstances of that evening. Whether it is negligent for someone to shoot at one person and accidentally hit another standing nearby depends on many factors, as this case well illustrates.

Edmonson testified that he shot at Brian Pawlisa because he believed that Brian was turning around to shoot at Edmonson or his fellow officers. He also testified that he was concerned for the safety of some youths from the local school who had gathered behind the police officers to watch the "excitement," apparently tipped off in advance that the robbery would take place. Another officer testified that the Pawlisas were running across the open field toward a residential community. In sum, Edmonson shot at Brian Pawlisa in order to prevent perceived serious harm to himself, his fellow officers, and other members of the community. The only person near enough to Brian to be accidentally hit was Scott Pawlisa, who was not an innocent bystander but rather a person just as guilty of armed robbery under Illinois law as was his brother Brian. While this does not mean that Edmonson was entitled to disregard the possibility that Scott would be injured by the shots intended for Brian, it does differentiate this case somewhat from the situation that would have been present if Edmonson's conduct had endangered the life of a completely innocent passerby. Lastly, there was evidence that Edmonson and the three other officers yelled "Halt, police" numerous times before firing any shots. Edmonson fired a warning shot into the air before finally taking aim at Brian Pawlisa. Viewing all of this evidence in the light most favorable to Edmonson, we conclude that there was sufficient evidence that Edmonson did what a reasonably careful person would have done under the circumstances to warrant submitting the question to the jury. The trial court accordingly did not err in denying Crawford's motion for a directed verdict against Edmonson on the issue of his liability in the shooting of Scott Pawlisa.

### III.

In conclusion, the district court's entry of judgment for the defendants is AFFIRMED.