**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Edward HOWARD and Thomas Cusack,**
**Defendants-Appellants.**

Nos. 84–2598, 84–2668.

United States Court of Appeals,
Seventh Circuit.

Argued April 24, 1985.

Decided Oct. 9, 1985.

Rehearing Denied Nov. 8, 1985
in No. 84–2668.

John Morrison, Barry A. Spevack, Monico & Pavich, Chicago, Ill., for defendants-appellants.

Alexander S. Vesselinovitch, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before COFFEY and FLAUM, Circuit Judges, and GIBSON, Senior Circuit Judge.*

FLAUM, Circuit Judge.

Defendant Edward Howard, a former Democratic precinct captain in the forty-fourth precinct of the thirty-ninth ward on the northwest side of the City of Chicago, and his co-defendant Thomas Cusack, a former assistant Democratic precinct captain in that precinct, appeal their convictions following a jury trial for committing various acts of vote fraud in connection with the November 2, 1982 general election. For the reasons set forth below, we affirm the convictions.

## I.

The evidence introduced at the defendants' ten-day trial, viewed in the light most favorable to the government, revealed a carefully-orchestrated scheme by the defendants to cast false ballots for the straight Democratic ticket in the November election. The ballot for the forty-fourth precinct in that election included a federal contest for the office of United States Representative for the Eleventh Congressional District, and myriad contests for state and local offices. In addition to the defendants, the participants in the conspiracy included Darryl Cunningham, a Democratic precinct worker, and Charlotte Watson, a Republican election judge, both of whom were named as unindicted co-conspirators in the indictment against the defendants. Cunningham and Watson, along with several others who had wittingly or unwittingly aided the defendants in the conspiracy, served as the primary government witnesses at trial.

As outlined at trial, the vote fraud scheme infected not only the actual voting process in November, but also the voter registration process preceding the election. Several persons, including the defendant Cusack, falsely registered to vote by claiming to reside at addresses within the precinct when they actually resided elsewhere. The actual residents at these addresses were asked to place name-tags on their doors that bore the names of the non-resident registrants. The defendants, and several others acting under their direction, also participated in a canvass of the precinct during September and October 1982. Although the canvass disclosed that a number of persons who were registered to vote in the precinct had died, moved away, or for some other reason had become ineligible to vote, these persons were not struck from the list of eligible voters. Finally, on election day the defendants, either personally or by acting through others, caused numerous false ballots to be cast for the straight Democratic ticket.

The defendants were charged in a thirty-three count indictment with offenses including conspiracy in violation of 18 U.S.C. §§ 241 and 371 (1982), voting more than once in an election held in part for the purpose of electing a member of the United States House of Representatives in violation of 42 U.S.C. § 1973i(e) (1982), giving false information to establish eligibility to vote in such an election in violation of 42 U.S.C. § 1973i(c) (1982), committing mail fraud in connection with the mailing of absentee ballots in violation of 18 U.S.C. § 1341 (1982), and aiding and abetting others in the commission of these offenses in violation of 18 U.S.C. § 2 (1982). Cusack was charged along with Howard in all of the counts except those relating to mail fraud and to false registration and voting by two particular individuals, Jerome and William Sufranski. Howard was ultimately convicted on twenty-three counts of the indictment after the jury returned guilty verdicts on all but the eight mail fraud counts and the judge directed a verdict of acquittal on two other counts. Cusack, on the other hand, was convicted pursuant to jury verdicts of guilty on fourteen counts of the indictment, but acquitted pursuant to not guilty verdicts on seven other counts. Howard was sentenced to five

---

* The Honorable Floyd R. Gibson, Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

years probation, with the first nine months to be served in a work-release program. Cusack was also sentenced to five years probation, but with the first six months to be served in a work-release program.

On appeal, the defendants raise numerous arguments for reversing their convictions. We have grouped these contentions under four general headings: (1) defects in the indictment, (2) insufficiency of the evidence, (3) trial errors, and (4) prosecutorial misconduct during closing argument. We consider each of these arguments in turn below.

## II.

### A. *Defects in the Indictment*

■ The most serious defects alleged by the defendants relate to counts one and two of the indictment, the conspiracy counts. The defendants initially contend that count one, which charges a conspiracy to violate the constitutional rights of qualified voters, is defective because it alleges in part a violation of a right that the defendants claim is not recognized by the United States Constitution: the right to vote in state and local elections free from vote fraud by persons acting under color of state law. The defendants further argue that both counts one and two are invalid because each is based on a general conspiracy statute, 18 U.S.C. §§ 241 and 371 respectively, that they characterize as preempted by the more specific prohibitions concerning vote fraud embodied in 42 U.S.C. § 1973. We need not discuss these arguments here, however, because this court recently rejected such arguments under essentially identical circumstances in *United States v. Olinger*, 759 F.2d 1293 (7th Cir.1985). The defendants have not suggested any basis for distinguishing *Olinger*, nor can we discern any. That decision accordingly controls our disposition here.

■ The defendant Howard's additional challenges to the indictment require only brief discussion. The summary assertion that various counts of the indictment are multiplicitous is plainly without merit, since each count, although related to the other counts, charges a separate offense requiring proof of a fact that the other counts do not. *See Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); *United States v. Aleman*, 609 F.2d 298, 306–07 (7th Cir.1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980). Howard's technical objections to count three of the indictment likewise do not state sufficient grounds for reversal of his conviction on this count. Howard points out for the first time on appeal that count three charges the defendants with voting "approximately twenty-two ballots as described in paragraphs 18 through 24 of Count One," although count one actually contains only twenty-three paragraphs and lists fewer than twenty-two ballots as having been voted. In light of Howard's failure to raise this objection below, his conviction must be affirmed unless the count "is so defective that it does not, by any reasonable construction, charge an offense for which the defendant is convicted." *United States v. Watkins*, 709 F.2d 475, 478 (7th Cir.1983) (quoting *United States v. Knippenberg*, 502 F.2d 1056, 1061 (7th Cir.1974)). Even assuming that count three is defective in some sense, it is clearly not so defective as to require reversal under this standard.

### B. *Insufficiency of the Evidence*

Defendants contend that the evidence was insufficient to support their convictions on various specific counts of the indictment. In mounting a challenge to the sufficiency of the evidence, the defendants bear a "heavy burden," *United States v. Garcia*, 562 F.2d 411, 414 (7th Cir.1977), for we may sustain such a challenge only if, viewing the evidence in the light most favorable to the government, no rational juror could have found the defendants guilty beyond a reasonable doubt. *See, e.g., United States v. Touloumis*, 771 F.2d 235, 238 (7th Cir.1985); *United States v. Mayo*, 721 F.2d 1084, 1087 (7th Cir.1983). After reviewing the extensive record developed over the course of the defendants'

ten-day trial, we find the evidence sufficient to support the jury's verdicts as to all of the counts on which the defendants were convicted, and find the defendants' arguments to the contrary to be without merit.

■ Only two of the defendants' arguments require specific discussion. First, both defendants vigorously assert that the evidence was insufficient to prove their guilt in directing Charlotte Watson on election day to execute several false ballot applications in the names of particular persons who did not actually vote. We disagree. Watson testified that on election day the defendants gave her slips of paper with names on them and instructed her to cast ballots for the straight Democratic ticket using these names, and that over the course of the day she did fill out several ballot applications and cast several ballots using these names. Watson also testified that by the end of the day she had not cast ballots for all of the names that the defendants had given her, and that when she so informed the defendant Cusack, he took a number of ballots and left the polling place with the defendant Howard. The defendants then returned to the polling place, according to Watson, and Cusack threw the ballots down on the table in front of her, whereupon she proceeded to complete ballot applications for and then to cast these ballots. If believed by the jury, Watson's testimony, which was corroborated by other physical and testimonial evidence in various respects, was sufficient to warrant the verdicts of guilty on the counts relating to the ballot applications that she forged.[1]

■ Cusack also contends that the evidence was insufficient to prove that he violated 42 U.S.C. § 1973i(c), which in pertinent part prohibits a person from:

> knowingly or wilfully giv[ing] false information as to his ... address ... for the purpose of establishing his eligibility to register or vote.... *Provided, however,* that this provision shall be applicable only to general, special, or primary elections held solely or in part for the purpose of selecting or electing any candidate for the office of ... Member of the United States House of Representatives....

The evidence at trial demonstrated that Cusack and his wife registered to vote on February 16, 1982, and then voted on election day in November, by using an address within the precinct at which they did not then reside. According to the testimony of one of the persons who actually resided at the address at which the Cusacks registered (Maria Popovich), the Cusacks also obtained the Popovichs' permission to place a tag bearing the Cusacks' name on the Popovichs' door. The Cusacks also instructed the Popovichs to tell anyone who came to visit the Cusacks that they were not at home.

Cusack argues that even if the evidence was sufficient to prove that he knowingly and willfully gave false information as charged, as we conclude it was, he nevertheless did not violate section 1973i(c) because his conduct was not adequately connected to a federal election. Cusack claims that although he did not reside within the precinct, he did reside within the Eleventh Congressional District and hence was entitled to vote anyway in the only federal election on the ballot, the election for member of the House of Representatives for that district. Therefore, Cusack reasons, his act of registering and voting at the Popovichs' address instead of his own address had no conceivable impact on the federal portion of the election, and thus did not violate section 1973i(c).

---

1. Nor do we accept the defendants' arguments that the jury's acquittal of Cusack on some counts concerning these ballot applications constitutes an implicit jury finding that Watson's testimony was incredible overall so as to mandate both defendants' acquittal on all of the counts to which Watson's testimony relates. We find nothing in the record to indicate that the reason for the jury's acquittal of Cusack on these counts was based on a rejection of all or part of Watson's testimony. Rather, we find that the other evidence connecting each defendant with each particular false ballot application charged in these counts varied in ways that might explain the jury's different verdicts as to each defendant.

Despite its superficial appeal, Cusack's argument is ultimately unconvincing. First, while expressly limiting its applicability to elections that at least in part involve a contest for federal office, the language of section 1973i(c) does not require the government to prove that the prohibited conduct had an actual or potential impact on the *result* of the federal contest. In fact, Cusack's conduct falls squarely within the express terms of the statute. *See United States v. Barker*, 514 F.2d 1077, 1082 (7th Cir.1975) (evidence that defendant knowingly completed ballot application using address at which he no longer lived in order to qualify to vote in one precinct when he actually lived in another precinct established section 1973i(c) violation). Second, the legislative history of the section, which was passed as part of the Voting Rights Act of 1965, evinces a congressional purpose "of providing a statute with 'extraordinary scope and sweep' with which to stop illegal voting practices." *United States v. Cianciulli*, 482 F.Supp. 585, 617 (E.D.Pa.1979). *See United States v. Malmay*, 671 F.2d 869, 873 (5th Cir.1982) (reviewing legislative history); *United States v. Cianciulli*, 482 F.Supp. at 613–18 (same).

In accordance with this congressional intent, courts have applied section 1973i(c) very broadly to any conduct that might tend to corrupt the federal aspect of an election, rejecting various attempts to limit the statute's scope. For example, this court in *United States v. Lewin*, 467 F.2d 1132, 1136 (7th Cir.1972), upheld the defendants' convictions for paying persons to register as voters in violation of the section's prohibitions on vote-buying despite the defendants' objection that the pertinent registrations applied to all elections in Illinois, rather than solely to federal elections. Several other courts have held that the section extends to a scheme to buy votes in a joint state/federal election even when the intended and likely effect of the scheme is limited solely to state or local candidates on the ballot. *See United States v. Saenz*, 747 F.2d 930, 943 (5th Cir.1984); *United States v. Mason*, 673 F.2d 737, 739 (4th Cir.1982); *United States v. Malmay*, 671 F.2d at 875. Finally, a federal district court has held that the section prohibits false voter registrations even when they were not made during a federal election year. *United States v. Cianciulli*, 482 F.Supp. at 616.[2] In line with these authorities, we hold that the evidence of Cusack's use of a false address to register for and vote in an election in which a federal contest was on the ballot was sufficient to establish a violation of section 1973i(c) regardless of whether he would have been qualified to vote in that contest if he had properly registered and voted using his actual address.[3]

**C. Trial Errors**

**1. Admission of Summary Chart**

 Both defendants strenuously contend that the court below erred in admitting over defense counsel's objections a chart that summarized the government's evidence concerning the forged ballot applications that were executed by Charlotte Watson and others on election day. As to each application, the chart listed in separate columns the application number, the purported voter's name and address, and the identity of the forger. Each application was also identified by a particular col-

---

**2.** The court in *Cianciulli* reached this result by concluding that the language of section 1973i(c) limiting its applicability to federal elections does not govern voter registration, but rather governs only the actual voting process. 482 F.Supp. at 616. We need not embrace this interpretation in the present case, however, since Cusack's registration occurred in an election year and was connected to the partially federal election in November.

**3.** The Supreme Court's decision in *Blitz v. United States*, 153 U.S. 308, 14 S.Ct. 924, 38 L.Ed. 725 (1894), relied upon heavily by Cusack, does not mandate a different result. The Court in *Blitz* held that, under an earlier vote fraud statute that was similar but not identical to section 1973i(c), a defendant could not be convicted of falsely voting in the name of another person where the indictment failed to allege that he actually voted for a federal candidate in the joint federal/state election at issue. *Id.* at 315, 14 S.Ct. at 927.

or code that corresponded to a certain geographic area on a precinct map, which in turn was introduced by the government to show which streets and addresses were canvassed by which precinct worker. The government introduced the chart through an F.B.I. agent who testified as a summary witness at the conclusion of the government's case-in-chief. This witness authenticated the chart as based upon evidence that had already been admitted in the case, that evidence being either the ballot applications themselves (which were admitted by stipulation) or prior in-court testimony.

■ As a number of courts have held in affirming the admission of summary charts in tax-evasion cases, the decision of whether to admit such summary charts is within the trial court's discretion, and will be reversed only for an abuse of that discretion. *See, e.g., United States v. Nelson,* 735 F.2d 1070, 1072 (8th Cir.1984); *United States v. Keltner,* 675 F.2d 602, 605–06 (4th Cir.), *cert. denied,* 459 U.S. 832, 103 S.Ct. 71, 74 L.Ed.2d 71 (1982). We find no abuse in this case. The chart accurately reflected the evidence that was introduced at trial. Indeed, when the evidence failed to disclose the identity of the person who forged the application, the chart so stated. The defendants' strongest objection to the chart relates to the color-coding, which the defendants argue impermissibly suggested their guilt in connection with any ballot application that was forged with the name of a voter who resided on one of the streets that they were responsible for canvassing.

The defendants' trial counsel, however, expressly stated to the court below that they had no objection to the color-coding of the chart. In this situation, we find no reversible error in the admission of the summary chart.[4]

## 2. Impeachment of Howard with Prior Conduct

■ Both defendants also object to, and claim prejudice from, the government's cross-examination of Howard concerning false statements that he made on two employment applications in 1974 and 1975. Howard had answered "no" to a question on each of these applications asking whether he had ever before been convicted or fined, imprisoned, or placed on probation, excluding minor traffic violations. In fact, as the government informed the judge at a conference prior to cross-examination, Howard had three prior convictions. The judge ruled that the government could ask Howard whether he had lied on the employment applications for impeachment purposes under Rule 608(b)(1) of the Federal Rules of Evidence,[5] but held the convictions themselves inadmissible. Accordingly, the judge strongly and repeatedly cautioned the government against alluding to the convictions themselves in the course of its cross-examination. When asked on cross-examination whether he had lied on the applications, Howard stated that he had not, explaining that he had been told that the applications did not require him to men-

4. The defendants argue that the chart was inadmissible under Fed.R.Evid. 1006, which allows the admission of charts summarizing the contents of "voluminous writings, recordings, or photographs that cannot conveniently be examined in court." Regardless of whether the chart fell within the precise confines of this Rule, the trial court nevertheless had discretion to permit the government to use it as a "pedagogical device [ ] to summarize or organize testimony or documents which have themselves been admitted in evidence." 5 *Weinstein's Evidence* ¶ 1006[07], at 1006–15 (1983). We note, however, that when a trial court authorizes the use of such charts as a teaching device rather than as substantive evidence under Rule 1006, the preferred practice would be for the court to give a limiting instruction regarding this purpose.

*Id.* at 1006–15 to 1006–16. *Accord United States v. Scales,* 594 F.2d 558, 563–64 (6th Cir.), *cert. denied,* 441 U.S. 946, 99 S.Ct. 2168, 60 L.Ed.2d 1049 (1979).

5. That Rule provides:
Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness....
Fed.R.Evid. 608(b)(1).

tion anything that had occurred ten years earlier. Howard did not elaborate on what had occurred ten years prior to his filling out the applications and, pursuant to the court's instructions, the prosecutor did not in any way reveal Howard's prior convictions to the jury.

The trial court properly exercised its discretion in allowing this cross-examination under Rule 608(b)(1). Howard placed his credibility in issue when he chose to testify. *United States v. Covelli*, 738 F.2d 847, 856 (7th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 211, 83 L.Ed.2d 141 (1984). Rule 608(b)(1) authorizes the impeachment of a witness with prior conduct that is probative of his truthfulness or untruthfulness, *id.*, and Howard's honesty or lack thereof on the employment applications was plainly probative in this sense. Moreover, the trial judge allowed no extrinsic evidence of the prior convictions to be introduced notwithstanding Howard's responses on cross-examination, *see United States v. Taylor*, 728 F.2d 864, 872–73 (7th Cir.1984), and meticulously and effectively admonished the prosecutor so as to limit any potential prejudice to the defendants from the questioning. We thus find no error in allowing this cross-examination.

3. Admission of Deceased Declarant's Hearsay Statements

■■■ Howard argues that both the Federal Rules of Evidence and his constitutional right to confrontation under the Sixth Amendment were violated when the trial court admitted certain hearsay statements of William Espina, who had died prior to trial. Espina was the actual resident at the address in the forty-fourth precinct that Jerome and William Sufranski had falsely used as their address in registering for and voting in the November election, acts for

which Howard was charged in several counts of the indictment. An F.B.I. agent testified at trial that when he interviewed Espina at his residence on February 9, 1983, he discovered a tag bearing the name "Sufranski" on Espina's door. Espina volunteered to the agent that Howard had put the tag on his door. The agent removed the tag at Espina's request, and it was introduced at trial. On June 1, 1983, an investigator for Howard's trial counsel interviewed Espina at his residence, and had the interview transcribed by a court reporter. The transcript of the interview, which was read to the jury, revealed Espina reaffirming that Howard had placed the Sufranski name-tag on his door.

The court below held Espina's statements admissible under Rule 804(b)(5) of the Federal Rules of Evidence,[6] the residual exception to the hearsay rule. Recognizing "that in applying this exception the district court has a considerable measure of discretion," *Huff v. White Motor Corp.*, 609 F.2d 286, 291 (7th Cir.1979), we affirm the district court's ruling. First, and most importantly, the statements possess the "circumstantial guarantees of trustworthiness" required for admission under the Rule. *See United States v. Boulahanis*, 677 F.2d 586, 588 (7th Cir.), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982). The statements were made by a seemingly disinterested witness under circumstances that created no apparent motive to lie. *See id.; Huff v. White Motor Corp.*, 609 F.2d at 292. In fact, Espina spontaneously volunteered at the very beginning of the interview with the F.B.I. agent that Howard had placed the name-tag on the door after the agent asked him simply whether he knew a family by the name of Sufranski. The event described in the statements—Howard's act of placing

6. That Rule provides for the admission, as an exception to the hearsay rule when the declarant is unavailable, of

[a] statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact;

(B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed.R.Evid. 804(b)(5).

the tag on the door—was directly observed by Espina, and was not so complex as to raise any serious questions concerning Espina's ability to perceive, remember, or recount it. Moreover, Espina made essentially the same statement not only once, but twice, and the latter time before both a person who identified himself as a private detective and a court reporter who transcribed the interview. While these statements, unlike those we held admissible in *Boulahanis*, 677 F.2d at 588, were not made under oath, we conclude that the other circumstances in this case render them equally reliable.

The statements also satisfy the materiality requirement of the Rule, since they are clearly relevant in showing Howard's connection to the Sufranskis' acts of false registration and voting. Further, despite Howard's speculation that the government might have turned up additional evidence by examining the name-tag itself for Howard's fingerprints or handwriting, we find that Espina's statements were "more probative on the point for which [they were] offered than any other evidence which the proponent [could] procure through reasonable efforts," as the Rule requires. Fed.R. Evid. 804(b)(5). As we noted in *Boulahanis,* the Rule "does not require that hearsay evidence be essential in order that it be admissible," but instead "[i]t is enough that it is the most probative evidence reasonably available on a material issue in the case." 677 F.2d at 589. Regardless of whether the government could or could not procure fingerprints or other evidence from the tag itself, Espina's statements constituted the only available direct proof that Howard placed the tag on the door. Finally, in light of the factors discussed above, we find no abuse of discretion in the trial court's conclusion that the general interests of justice were best served by the admission of the statements. *See Huff,* 609 F.2d at 295.

The statements likewise meet the requirements for admission under the Confrontation Clause of the Sixth Amendment. *See Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980); *United States v. Boulahanis,* 677 F.2d at 589. The government obviously demonstrated the unavailability of Espina as a witness, *see Ohio v. Roberts,* 448 U.S. at 65, 100 S.Ct. at 2538, and further made a strong "showing of particularized guarantees of trustworthiness" concerning the statements, *id.* at 66. In sum, after considering Espina's statements in the context in which they were made, "we are satisfied that there are present in this case sufficient badges of trustworthiness to meet the tests of Rule 804(b)(5) and of the Sixth Amendment." *United States v. Murphy,* 696 F.2d 282, 286 (4th Cir.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1303 (1983).

4. Admission of Tape-Recorded Conversations

■ Howard characterizes as reversible error the trial court's admission of tape recordings and transcripts of several telephone conversations between Howard and Charlotte Watson in early January 1983. In these conversations, which were initiated by Watson from the Chicago F.B.I. office and recorded by the F.B.I., Watson told Howard that she was scared and asked him how she should respond to being contacted by the F.B.I. While Howard never admitted to any criminal conduct in these conversations, he repeatedly warned her not to talk to anyone, including the F.B.I., on the phone or otherwise. Rather, Howard told Watson to contact a lawyer for the Cook County Democratic Organization, whose name and number he gave to Watson, and who Howard said "does the talking for you." On appeal, Howard objects to the admission of these conversations solely on the ground that their probative value is substantially outweighed by their prejudicial impact under Fed.R.Evid. 403.

As this court has consistently emphasized, "[s]ince an appellate court must give great deference to the trial judge who saw and heard the evidence, we will reverse a determination by a trial judge that the probative value of the proffered evidence outweighs its prejudicial impact only for an

abuse of discretion." *United States v. Touloumis,* 771 F.2d 235, 239 (7th Cir. 1985). *See, e.g., Crawford v. Edmonson,* 764 F.2d 479, 484 (7th Cir.1985); *United States v. Pizarro,* 756 F.2d 579, 584 (7th Cir.1985); *United States v. Medina,* 755 F.2d 1269, 1274 (7th Cir.1985). The trial record reveals that the court below carefully considered both the probative value and the potential for prejudice inherent in the conversations. The court ultimately found that the jury could reasonably conclude from these conversations that Howard was telling Watson to remain silent in order to protect himself, a conclusion that would of course be probative in this case. In light of the many nuances and levels of meaning contained in a telephone conversation, we cannot conclude that the conversations between Howard and Watson were not probative in this sense. Although the issue is sufficiently close that the court in its discretion might have decided to exclude the tapes because of their potential for prejudice, *see United States v. Barletta,* 652 F.2d 218, 220 (1st Cir.1981), we find no abuse of discretion in the trial court's decision to admit them.

### 5. Other Errors

The defendants allege that the trial court committed numerous other reversible errors by improperly admitting evidence and unduly restricting defense counsel's cross-examination of certain government witnesses. Upon examining the record, we have concluded that these additional contentions are wholly without merit, and require no further discussion.

### D. *Prosecutorial Misconduct*

██ The final and most troubling issue on appeal is whether the defendants were denied a fair trial as a result of various allegedly improper and prejudicial comments made by the prosecution during closing arguments at trial. Without cataloging all of the myriad remarks cited by the defendants as examples of prosecutorial misconduct, the transcript of final arguments below reveals that the prosecution's remarks cannot be characterized as always reflecting the best examples of responsible trial advocacy. In order to rebut a claim that the government had sought to deceive the jury, one of the prosecutors stated in his final rebuttal argument:

> We have not tried to deceive you, ladies and gentlemen. We have tried to bring out the truth, and I can tell you ... when I stood up, took my oath to be an Assistant United States Attorney, it was one of the proudest days of my life, and I am not going to jeopardize it with misconduct or deception. My job is to bring out the truth and see that justice is done in this case, and that is what we have been doing in this case.

This unwarranted appeal to the authority and prestige of the United States Attorney's Office becomes understandable—though still not fully acceptable—when considered against the backdrop of the out of place and therefore uncalled for *ad hominem* attacks by counsel for the defendant Howard that preceded it. In arguing that the prosecution in general, and one of the prosecutors in particular, had intentionally misrepresented evidence, counsel for Howard said to the jury:

> I think that's one of the shabbiest and shoddiest things I've seen in this building in years, and I would like them and [one of the prosecutors] to get up here and explain to you why he tried to deceive you.... Let him explain that to you, and I'll sit here with the rest of us and listen to his explanation, listen to his explanation as to why he tried to pull a fast one in this court on you people to try to convict these people. Is it that desperate? Did they need his scalp so bad? What, are they going to put a headline in their office? Is it going to help them get a better job when they leave the U.S. Attorney's office, to try to deceive you?

While these two passages may represent the most inappropriate comments by the prosecution and defense, they unfortunately do not stand alone in reflecting the tone

of the final arguments in this case.[7] Rather, the record demonstrates that counsel's arguments on more than one occasion strayed from the arena of fair comment into the area of appeals to emotion and personal attack—a place where the highly experienced and able counsel in this case should not have entered.

The Supreme Court issued a stern warning against these kinds of inflammatory arguments in a case decided just last term, *United States v. Young,* —— U.S. ——, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). In *Young,* the Court stressed the duty of both prosecutors and defense counsel to refrain from, among other things, engaging in personal attacks on opposing counsel. *Id.* at 1042–44. The Court also clarified that a prosecutor is not given license to make otherwise improper arguments merely because defense counsel provoked such a response. *Id.* at 1044–45. The preferred practice is instead for the prosecutor to "object[ ] to the defense counsel's improper statements with a request that the court give a timely warning and curative instruction to the jury." *Id.* at 1045. The Court likewise noted the trial judge's ·independent "responsibility to maintain decorum in keeping with the nature of the proceeding," *id.* at 1044, and explained that the judge in some cases might act *sua sponte* by convening a bench conference after the conclusion of an argument, or even by interrupting an argument and admonishing counsel under certain circumstances, *id.* at 1045–46.

A recognition that the prosecution committed error in addressing the jury, and that this error would not be excused by defense counsel's prior misconduct, nevertheless would not mandate reversal of the defendants' convictions. In evaluating claims of prosecutorial misconduct, this court has consistently employed "the well-settled standard of review that we are to consider the prosecutor's conduct not in isolation, but in the context of the trial as a whole, to determine if such conduct was 'so inflammatory and prejudicial to the defendant ... as to deprive him of a fair trial.' " *United States v. Chaimson,* 760 F.2d 798, 809 (7th Cir.1985) (quoting *United States v. Zylstra,* 713 F.2d 1332, 1339 (7th Cir.), *cert. denied,* 464 U.S. 965, 104 S.Ct. 403, 78 L.Ed.2d 344 (1983)). *See, e.g., United States v. Touloumis,* 771 F.2d 235, 243 (7th Cir.1985); *United States v. Carter,* 720 F.2d 941, 950 (7th Cir.1983); *United States v. Reagan,* 694 F.2d 1075, 1079 (7th Cir. 1982). Applying this standard,[8] we conclude that the statements by the prosecution during closing arguments did not deny the defendants a fair trial in the context of this case.

---

7. At various points in their arguments, the prosecutors: (1) exhorted the jury to "show" the defendants "that this is one vote count they can't rig, one jury they can't fix, one set of laws they can't bend," (2) charged that the defendants "when caught red-handed will tell any lie, will have their cohorts tell any lie ... no matter how big, to save their hides from the fate that they so richly deserve," and (3) in commenting on the credibility of the defendant Cusack and his former wife Grace Cusack, who testified at trial, told ·the jury "I don't think you should have sympathy for a man who makes his former wife get up on the witness stand and commit perjury." In addition to the comment quoted in the text above, counsel for Howard repeated several times the accusation that the prosecution had sought to "mislead" the jury, and after commenting at length on the alleged lack of evidence to convict Howard, stated: "I think what disturbs me more is the total lack of fairness that we have faced in this courtroom, not from the Court, but from the prosecution."

8. We note that a number of the prosecutors' remarks that the defendants object to on appeal—including the remarks quoted in the text above—are subject to review only for "plain error" in light of defense counsel's failure to object to these comments at trial. *United States v. Young,* —— U.S. ——, 105 S.Ct. 1038, 1046 (1985); *United States v. Carter,* 720 F.2d 941, 950 n. 7 (7th Cir.1983); *United States v. West,* 670 F.2d 675, 688 (7th Cir.), *cert. denied,* 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982); Fed.R.Crim.P. 52(b). As the Supreme Court stressed in holding that a prosecutor's improper closing argument did not constitute plain error in *Young,* the plain error doctrine applies only to the most egregious and prejudicial of errors. 105 S.Ct. at 1046–47. Since we hold that the prosecutors' comments in this case did not in any event deny the defendants a fair trial, we will not divide the comments for purposes of our analysis according to whether they are reviewable under a normal or plain error standard.

First, notwithstanding its conclusion that improper prosecutorial arguments are not justified by the fact that they were made in response to similarly inappropriate arguments by defense counsel, the Court in *Young* did recognize the relevance of defense counsel's conduct in assessing the likely prejudice resulting from improper comments by the prosecutor. 105 S.Ct. at 1045. Noting its prior decision in *Lawn v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958), which pointed to the fact that the prosecutorial comments at issue were invited by defense counsel in concluding that the comments did not deprive the defendant of a fair trial, the Court in *Young* explained:

> [A]s *Lawn* teaches, the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's response would have had on the jury's ability to judge the evidence fairly. In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant.

105 S.Ct. at 1045. Prior decisions of this court have also consistently recognized the significance of whether a particular prosecutorial remark was invited by defense counsel in assessing that remark on appeal. *See, e.g., United States v. Perez-Leon*, 757 F.2d 866, 876 (7th Cir.1985); *United States v. West*, 670 F.2d 675, 688–89 (7th Cir.), *cert. denied*, 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982). When thus considered in light of defense counsel's prior statements, comments by the prosecutors in this case such as that quoted above did not render the defendants' trial fundamentally unfair. *Cf. United States v. West*, 670 F.2d at 689 (similar government response placing weight and prestige of United States Attorney's Office behind its case not reversible error because it was "invited and within the bounds of proper argument").

Second, the trial judge mitigated the impact of any improper prosecutorial arguments in this case, whether or not provoked by defense counsel, by repeatedly cautioning the jury both during the arguments themselves and in the final jury instructions to consider the attorneys' statements in closing arguments only to the extent that they were supported by the evidence. *See, e.g., United States v. Chaimson*, 760 F.2d at 811; *United States v. Reagan*, 694 F.2d at 1080; *United States v. Allain*, 671 F.2d 248, 253 (7th Cir.1982). The judge also sustained a defense objection and instructed the jury to disregard one of the prosecutorial remarks that the defendants most vigorously object to on appeal: the statement that the jury should "show" the defendants "that this is one vote count they can't rig, one jury they can't fix, one set of laws they can't bend." Given the trial judge's admonitions, we do not believe that the prosecution's closing arguments in this case so distracted the jury from its proper task as to prejudice the defendants.

With regard to the unique obligations of the prosecution, *see Young*, 105 S.Ct. at 1043 n. 6, we have often warned in the past, and reiterate here: "Failure of Government counsel to observe proper standards in their closing arguments has resulted, all too frequently, in this court's devoting substantial time to reviewing the record to determine the probable effect of the improper argument. It may well in some case result in a reversal which could have been avoided by adherence to proper standards." *United States v. Falk*, 605 F.2d 1005, 1013 n. 13 (7th Cir.1979), *cert. denied*, 445 U.S. 903, 100 S.Ct. 1079, 63 L.Ed.2d 319 (1980). *See United States v. Carter*, 720 F.2d 951 n. 10; *United States v. Allain*, 671 F.2d at 254; *United States v. Spain*, 536 F.2d 170, 176 (7th Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97 (1976). We expect that in the future the government will avoid such problems as occurred in this case by responding to improper comments by defense counsel with a prompt objection addressed to the trial judge, rather than with similar inappropriate arguments addressed to the jury.

III.

The defendants' convictions are accordingly AFFIRMED.