**EASTER HOUSE, an Illinois, not-for-profit corporation, Plaintiff–Appellee,**

v.

**Thomas FELDER, Florence McGuire and Joan Satoloe, Defendants–Appellants.**

**No. 86–2164.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 2, 1987.

Decided July 8, 1988.

902

See also, 663 F.Supp. 456 and 645 F.Supp. 107.

Thomas A. Ioppolo, Office of the Atty. Gen., Chicago, Ill., for defendants-appellants.

James R. Figliulo, Foran, Wiss & Schultz, Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, CUDAHY and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

Defendants in this section 1983 action, employees of the Illinois Department of Children and Family Services ("DCFS"), appeal from a judgment entered on a jury verdict. The jury found that in two separate instances these employees acted under color of state law to deprive Easter House, a Chicago-based adoption agency, of property without due process of law. On the first count, the jury found that during late 1974 and early 1975 the DCFS employees conspired with Millicent Smith, a former Easter House employee, to deprive Easter House of its operating license and to expedite the licensing of Smith's new agency, named Easter House Adoption Agency, Inc. ("Easter House II"), with the intention of transferring Easter House's business to Smith. On the second count, the jury found that two of the state employees again deprived Easter House of property without due process during 1977 and 1978 by conducting unwarranted investigations of its operations.

The trial court denied the defendants' motion for judgment n.o.v. or a new trial. The DCFS defendants then brought this appeal. (Millicent Smith, the sole private defendant remaining in the action by the time of the trial, did not appeal.) The defendants argue that (1) Easter House failed to identify any property interest of which it was deprived under color of state law; (2) section 1983 is not available to the plaintiffs because adequate state law remedies provided all the process that was due; (3) defendants are protected by qualified immunity because none of their actions clearly violated contemporaneous standards of due process; (4) the district court erred in its conspiracy instructions; and (5) the damages awarded on count I are excessive. For the reasons explained below, we affirm on count I as to liability and damages and reverse on count II on the grounds that the investigation infringed no protected property interest.

I.

Easter House claims that its property was taken without due process of law through two distinct conspiracies. The first was a plan by the DCFS defendants and Millicent Smith, Easter House's former Executive Director, to strip Easter House of its license to operate a "child welfare agency" in Illinois and to establish a new agency with an almost identical name under Smith's control. The second was an alleged plot by two of the three DCFS defendants to drive Easter House out of business by harassing it with continuing, unwarranted investigations of its operations. The essential facts surrounding these two episodes will be described separately.

A.

The first conspiracy that Easter House described to the jury proceeded on two fronts simultaneously. While DCFS was delaying the renewal of Easter House's license, it was also assisting in the creation of Easter House II. Events leading up to the delay of Easter House's license renewal began in late November 1974, as the November 30th expiration of Easter House's two-year license approached. The parties agree about most of the facts surrounding the delay in the issuance of Easter House's new license, though they disagree sharply about the inferences that a jury could reasonably draw from those events. Joan Satoloe, a licensing representative assigned to DCFS's Chicago office, prepared a relicensing study which recommended renewal of Easter House's license for the two-year period beginning December 1, 1974. This recommendation was then forwarded to DCFS's main office in Springfield where the licenses are issued.

On December 30, 1974, while Satoloe was on vacation, Smith met at DCFS's Chicago offices with Satoloe's immediate superior, Florence McGuire, the licensing supervisor for DCFS's central district. According to Smith's testimony, this was her second discussion with McGuire concerning her plans to leave Easter House, the first having occurred at some point prior to December

17th as Smith was preparing the incorporation forms for Easter House II.[1] During the December 30th meeting, according to a memorandum from McGuire to Satoloe written later that day, Smith described the reasons for her growing disenchantment with Easter House and her plans to found Easter House II. Smith reported that she had decided to leave Easter House because Seymour Kurtz, Easter House's owner and president, had altered his longstanding practice of delegating day-to-day management to Smith and started to play a more active role. Smith also stated that Easter House had brought several new people into the operation who answered to Kurtz rather than to her. Smith indicated that she was frustrated by her inability to halt practices of the new employees that she found objectionable, including careless handling of confidential adoption records and telephone solicitation of affluent former clients to increase the number of placements. McGuire's memorandum also recounted vague allegations that Easter House was connected to foreign adoption agencies through which Kurtz had told Smith he expected "to make a million."

Smith, according to the memorandum, indicated that she intended to leave Easter House immediately and disclosed some of the details of her plan. To minimize Kurtz's opposition to the new agency, Smith had concealed her plan from Kurtz. She had arranged for her sister, Pacita Haire, to sign the charter application and had waited for Kurtz's year-end vacation to make her move. To ensure that her leaving would not deprive her of the rewards to which she felt entitled based on her long tenure at Easter House, Smith had resolved to use a name closely resembling Easter House's and to take Easter House's files. Smith reported having removed all the active case files and indicated that she planned to remove the closed files before Kurtz's return.

After the meeting, McGuire called DCFS's Springfield office to request a delay in the mailing of Easter House's renewed license. On the following day, December 31st, Smith wrote to McGuire, Satoloe and Thomas Felder, the Chief of DCFS for the central district. Smith described the prior day's meeting to Satoloe and Thomas Felder and stressed the importance of rapid action on Easter House II's charter application. In her letter to McGuire, Smith indicated that Fran Riley, Easter House's only other trained social worker, had decided to leave Easter House and join Easter House II. Smith also thanked McGuire for withholding Easter House's license. On that same day, Smith wrote to Kurtz resigning her position at Easter House.

After discussing Easter House's situation with McGuire, Felder decided that Easter House's renewed license should be kept on hold at the Springfield office. On January 6, 1975, Felder wrote to Kurtz informing him that the departures of Smith and Riley, Easter House's only trained social workers, had put the agency out of compliance with DCFS's licensing standards and that if Easter House wished to resume operations it would have to reattain minimum standards and reapply for a license.[2] At trial, Felder testified that he withheld renewal of Easter House's license under authority of section 8(1) of the Illi-

1. Defendants dispute that Smith and McGuire discussed the formation of Easter House II at any time before the December 30th meeting. Millicent Smith testified, however, that she had decided to list her sister as the incorporator after McGuire discouraged her from naming her husband in this capacity. Acknowledging that her sister had signed the form on December 17th, Smith conceded that her first conversation with McGuire occurred sometime before that date. Tr. at 1350–51 (June 16, 1986). The defendants point out that DCFS's chronology, prepared in May 1975, after the possibility of legal repercussions had become clear, makes no mention of this earlier meeting. We do not agree with defendants' argument that the chronology decisively refutes Smith's testimony on this point. In fact, we think that a reasonable jury would be likely to find that this inconsistency cast more doubt on the veracity of the chronology than on the veracity of Smith's admission against interest.

2. The licensing standard in question, DCFS Regulation 5.10 (1970), required child welfare agencies to have at least one employee with a Master of Social Work degree and two years of supervisory experience in social work.

nois Child Care Act of 1969. 1969 Ill.Laws 105 (current version at Ill.Rev.Stat. ch. 23, para. 2218(1) (1986)). This provision authorized DCFS to refuse to renew the license of an agency that "consistently fail[ed] to maintain standards prescribed and published by the Department." Felder conceded during cross-examination, however, that the suspension was inconsistent with the Illinois Child Care Act and with the Department's regulations and enforcement manual, which set forth various steps that the Department would take to bring a licensee into compliance with minimum standards before revoking or refusing to renew a license.[3]

Two days after sending the first letter, Felder, on the advice of a DCFS attorney, wrote a second letter to Kurtz informing him that the January 6th letter had been incorrect and that Easter House would have ten days from receipt of the second letter to request a hearing before DCFS's refusal to renew would become final. Felder was advised to extend this request for a hearing because the Illinois Child Care Act of 1969 allowed licensees ten days to request a hearing to contest the Department's proposed revocation or refusal to renew a license. The second letter did not, however, offer to provide the assistance required by the Department's regulations and enforcement manual.

Kurtz did not receive the first or second letters from DCFS until January 21, 1975, because Millicent Smith had directed the Post Office to forward Easter House's mail to Easter House II. On January 22nd, Kurtz wrote to DCFS requesting a hearing and a written statement of charges. During the period between the decision to withhold renewal and Kurtz's response, DCFS received two inquiries about the status of Easter House, one from a lawyer representing prospective clients and one from a social worker interested in applying for the position that Smith had left. Both callers were told that Easter House had no license; the prospective job applicant was further informed that DCFS was in the process of reviewing Easter House's "entire program." Also during this period, Felder wrote to Judge Comerford, then the Chief Judge for adoptions in Cook County, and notified him that Easter House was no longer licensed to make adoption placements.

Within four weeks of receiving DCFS's letters, Kurtz obtained his renewed license. On February 4th, two weeks after he had hired a new Executive Director, Kurtz met with Felder to discuss information that Kurtz had obtained about Smith's new operation (see *infra*) and the relicensing of Easter House. At that meeting, Kurtz waived the hearing that had been offered in the January 8th letter after Felder assured him that the absence of proper staff was the only barrier to the issuance of Easter House's license. Soon thereafter, Satoloe visited Easter House and approved the new Executive Director's credentials. On February 19, 1975, Easter House received its renewed license to operate as a child welfare agency during the period from December 1, 1974 through November 30, 1975.

While DCFS was acting on Easter House's application to renew its license, it was also acting on charter and license applications for Easter House II. The charter sought by Easter House II was essentially a certificate of incorporation. Child welfare agencies, however, unlike ordinary corporations, were subjected to charter studies by DCFS in addition to the usual processing by the Illinois Department of State. Charter studies for child welfare

---

**3.** Section 7(c) of the Child Care Act, Ill.Rev.Stat. ch. 23, para. 2217(c) (1986), stated that DCFS "shall offer consultation ... to assist applicants and licensees in meeting and maintaining minimum requirements." Section 5.02(II) of the Department's regulations stated: "Reasonable efforts by the Department shall be made to assist a licensed child care facility to meet minimum standards. If, after such efforts, the facility fails to meet applicable standards, the license of such facility shall be revoked or not renewed." Section 15 of DCFS's enforcement manual also emphasized cooperative efforts to avoid revoking or suspending licenses. It indicated that licenses should not be revoked or renewals withheld until state officials had met with the licensee to discuss inadequacies and provided ten to fourteen days for the correction of violations.

agencies, according to Felder's testimony, were intended to ensure that new agencies would serve the public interest. Tr. at 112–13 (June 13, 1986). DCFS's charter studies sought to determine, among other things, whether the agency would serve a public need and whether the people forming the agency were reputable. A license, as noted above, certified that the agency conformed with DCFS's minimum standards. The procedures for issuing initial licenses did not differ significantly from the procedures for license renewals.

Easter House II's charter application was submitted to the Illinois Department of State on December 17, 1974, and forwarded to DCFS's Chicago office on January 2, 1975. The charter application listed Pacita Haire, Smith's sister and a complete novice in the adoption field, as the incorporator and Truman Gibson, a Chicago attorney, as the President and Chairman of the Board. On January 6, 1975, Easter House II submitted its license application to DCFS. The Chicago office forwarded its recommendation that a charter and license be issued to Easter House II on February 6, 1975.

At trial, Easter House produced evidence that DCFS's approval of Easter House II's charter and license application had been extremely irregular. The plaintiff showed that the DCFS defendants knew of conduct by Smith that, at a minimum, cast doubt on her fitness. The plaintiff also produced evidence that the charter and license studies were not conducted in accordance with normal procedures.

While Easter House II's application was pending, the defendants learned a great deal about Smith both from their direct interactions with her and from complaints lodged by Kurtz. By the time that the Chicago office of DCFS recommended approval of Easter House II's applications, the defendants knew that (1) Smith had attempted to divert Easter House's mail and telephone calls to her new address, (2) she had insisted for some time (though with some indications of reconsidering) on using a name confusingly similar to Easter House's despite warnings that the similari-

ty could mislead the public, (3) Smith had taken files from Easter House, and (4) she had attempted to place an adopted child with a couple who believed they were still working with Easter House before Easter House II was licensed to act as a child welfare agency.

The first two steps of these factors were relatively insignificant. Smith's efforts with respect to the mail and telephone service had little practical effect: it appears that none of Easter House's mail was ever delivered to Smith (although it was delayed from reaching Kurtz for a time) and Easter House's telephone service was never interrupted. The defendants acknowledged that they had been concerned that the public would be confused by the similarity of the names for Smith's and Kurtz's agencies. McGuire, Felder and Smith all testified that the defendants had attempted, without success, to dissuade Smith from using Easter House's name for this reason. Easter House II was, however, approved by the Illinois Secretary of State as part of the chartering process. Felder testified that DCFS's legal department had informed him that the agency lacked authority to block a charter or license based on this type of confusion. The letter notifying Smith that her license had been approved indicated that the Department could not block the license on this ground, but nonetheless warned Smith that use of Easter House II could give rise to legal action by Easter House.

Smith's removal of Easter House's files represented a more serious matter, since Easter House was unable to manage its cases, or to arrange for some other agency to manage its cases pending renewal of its license, without the information these files contained. In her letters to Kurtz and her testimony at trial, Smith claimed that she had taken the files to preserve the confidentiality of the records and not to take Easter House's business. A contrary inference could be drawn, however, from Smith's representation to McGuire that, in the words of McGuire's summary, Smith intended to end her association with Kurtz in a way that would not "allow to go down the drain the eleven years of experience

and hard work she had put into building up Easter House." At trial, Felder stated that DCFS had believed Smith's professions of concern about confidentiality and took the position that the return of the records was a matter strictly between Kurtz and Smith.

The most serious factor that DCFS overlooked in approving Smith's application was her attempt to place a child with adoptive parents before she was licensed. On February 3, 1975, Kurtz told Felder that he had spoken with a couple that applied to Easter House for an adoption prior to Smith's departure. The couple, who had thought they were still dealing with Easter House, had received the baby from Smith and given Smith a check for $3,000. When they attempted to contact Smith later at Easter House they spoke with Kurtz instead. When Felder confronted Smith with Kurtz's information, she initially denied any knowledge of the matter, but called back fifteen minutes later to admit that she had made the placement. Because the placement was legally invalid, payment on the check was stopped and a court proceeding was arranged to legalize the adoption.

The defendants appear not to have considered this episode as relevant to Smith's fitness to run an adoption agency. Three days after this illegal placement came to light, before the adoption had been legalized, the Chicago DCFS office recommended to Springfield that Smith's charter and license be approved. Defendants point out that Felder brought Smith's action to the attention of the State's Attorney. Felder's letter reporting the matter, however, seems to downplay the incident. It describes the unlawful placement vaguely as "an apparent violation of the Child Care Act"; it identifies the "primary informant" as Smith's former employer, suggesting that the allegation may be inaccurate; it stresses that the adoption was subsequently legalized by the court; and it mentions that DCFS subsequently saw fit to approve

Smith's license. The letter does not mention that Smith apparently represented herself as an agent of Easter House to the adoptive parents and biological mother or that she initially denied the incident to Felder. The timing of Felder's letter to the State's Attorney also undercuts its usefulness to the defendants: it was sent on March 20, 1975, more than six weeks after Felder first learned of the attempted placement, but only ten days after Felder and his superior in Springfield received letters from an attorney inquiring on Kurtz's behalf as to DCFS's intended response to Smith's actions.

The jury also heard evidence that DCFS fabricated certain aspects of the charter investigation and prepared the license study *after* approving Smith's application. The charter study included reports of interviews with Pacita Haire, who was listed as the incorporator, and Truman Gibson, an attorney who assisted Smith with the incorporation and who was listed as the President of Easter House II. However, during the trial, both Haire and Gibson denied having been interviewed by DCFS officials.[4] The license study is undated; its text, however, refers to a March 17, 1975 letter from the head of DCFS to the Secretary of State, indicating that it was prepared at least forty-one days after the Chicago office's recommendation had been sent to Springfield.

### B.

The second count pertains to DCFS's investigation of Easter House's operations during 1976 and 1977. Easter House showed that Felder and McGuire conducted an intensive investigation of Easter House beginning in late 1976 with McGuire's review of Easter House's application to renew its license. Later, in early 1977, defendants dispatched investigator Tom Howard to undertake a more thorough review. Howard conducted a pretext investigation

---

4. Haire's and Gibson's testimony cast doubt on the veracity of the charter and license applications themselves as well as on DCFS's review process. Specifically, Haire denied that she had ever expressed a willingness to take an active role in the new agency or that she had invested money in the agency. Tr. at 741–45 (June 9, 1986). Gibson denied that the signature on the license application next to his name was in fact his. *Id.* at 751–52.

in which another investigator posed as a prospective parent; he also undertook a thorough review of Easter House's files with particular emphasis on Easter House's dealings with Kurtz's foreign foundations. Howard testified that on three occasions he reported negative results to the defendants and offered his opinion that Easter House was operating legally. Tr. at 770–76 (June 10, 1986). On each occasion, he was instructed to redouble his efforts to find evidence of wrongdoing.

## II.

This case has been before this court four times during its twelve-year history. Early in the litigation, the private defendants filed a motion to dismiss. This motion convinced the district court that Easter House had failed to show that the private defendants had acted "under color of state law." The district court therefore dismissed Easter House's charges against the private defendants for failure to state a claim under 42 U.S.C. section 1983. This court reversed in an unpublished order which held that the conspiracy allegations contained in count one of Easter House's complaint made out an adequate claim of action under color of state law. *Easter House v. State of Illinois, Dep't of Children and Family Servs.*, 577 F.2d 747 (7th Cir.1978).

Later, the case was twice dismissed by the district court on grounds that plaintiffs had failed to prosecute their claim. On both occasions, this court issued an unpublished order reversing the dismissal and remanding for further proceedings. *Easter House v. State of Illinois*, 661 F.2d 938 (7th Cir.1981); *Easter House v. State of Illinois*, 745 F.2d 60 (7th Cir.1984).

After this court's reversal of the second dismissal for failure to prosecute, the parties completed discovery and prepared for trial. On May 15, 1986, less than three weeks before the date scheduled for the beginning of the trial, defendants filed a motion for summary judgment asserting that they were protected from Easter House's damage claims by the qualified immunity doctrine set forth in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73

L.Ed.2d 396 (1982). The district court immediately rejected the motion as untimely filed. Two weeks later, just one week before the scheduled trial date, this court affirmed the district court's rejection of the summary judgment motion. *Easter House v. Leahy*, 792 F.2d 143 (7th Cir.1986). We stressed, however, that we were only rejecting the defendants' asserted right to avoid trial on the merits by filing a last minute summary judgment motion. Our decision expressly disclaimed any prejudice to "any immunity defense that [defendants] may have to judgment on the merits." *Id.* at 904.

## III.

Easter House's second count, which seeks damages for DCFS's 1977 investigations, requires relatively little discussion. We will dispose of it first and confine the remainder of our analysis to the more difficult issues raised by the first count.

Following the Supreme Court's approach in *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), we focus initially on two essential questions: "(1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Id.* at 535, 101 S.Ct. at 1913; *see Greco v. Guss*, 775 F.2d 161, 164 (7th Cir.1985). Felder and McGuire concede, as they must, that they were acting under color of state law when they investigated Easter House.

Defendants do argue, though, that Easter House has not identified any constitutionally protected interest that was infringed by the investigation or shown that it incurred any cognizable harm. The district judge rejected the defendants' position and sent the claim to the jury with an instruction that

Easter House has a constitutional right and liberty to operate its business without unfounded harassment by State officials....

If you find that Easter House's due process rights were violated, but that it

suffered no actual injury resulting from the violation, then you should award Easter House nominal damages in the amount of one dollar.

Tr. at 1590–91 (June 17, 1986). We think that the district court erred in refusing to grant the directed verdict and in giving this instruction.[5]

■ Easter House has not identified any support for its purported due process right "to be free from unfounded harassment" or indicated whether this right implicates a property or liberty interest. The claim seems, in essense, to be one of malicious prosecution. However, a showing of malicious prosecution—or, as in this case, of malicious administrative investigation— does not make out a claim under section 1983. The plaintiff, in addition to being the target of an improperly motivated investigation, must be "subjected ... to a deprivation of constitutional magnitude." *Hampton v. Hanrahan,* 600 F.2d 600, 630 (7th Cir.1979), *rev'd in part on other grounds,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980); *see Cameo Convalescent Center, Inc. v. Senn,* 738 F.2d 836, 845 (7th Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 780, 83 L.Ed.2d 775 (1985).[6] "[M]alicious prosecution, standing alone, is insufficient to state a claim for relief under Section 1983." *Antonelli v. Burnham,* 582 F.Supp. 1067, 1071 (N.D.Ill.1984); *see also Grove School v. Guardianship & Advocacy Comm'n,* 642 F.Supp. 1043, 1048 (N.D.Ill.1986) (investigation by state regulatory authority does not violate constitution merely because it may discredit views of school administrator).

■ Unwarranted investigation by licensing officials, conducted in a manner calculated to discourage customers or interfere with a licensee's business, has been held to violate a property right. *See McGee v. Hester,* 724 F.2d 89, 92 (8th Cir. 1983); *see also McGee v. Hester,* 815 F.2d

1193 (8th Cir.1987) (affirming jury verdict for plaintiff), *cert. denied,* — U.S. —, 108 S.Ct. 451, 98 L.Ed.2d 392 (1987). In *McGee,* an Arkansas liquor store owner alleged that officials of the Tennessee control board had driven away his customers through conspicuous surveillance techniques that included photographing and following them around on his premises. *See also Reed v. Village of Shorewood,* 704 F.2d 943, 949 (7th Cir.1983) ("harassment of customers and employees and relentless, baseless prosecutions" could constitute deprivation of property). Easter House's allegations are clearly distinguishable. The only concrete injury even suggested by Easter House's evidence on the second count is the cost of answering the questions of DCFS personnel and making files available to them. These costs do not rise to the level of a constitutional deprivation of property. *See Reichenberger v. Pritchard,* 660 F.2d 280, 285 (7th Cir.1981) ("legal fees expended by the plaintiffs in the administrative proceedings cannot qualify as a constitutional injury absent a showing of deprivation of constitutional magnitude").

## IV.

Easter House's allegations concerning the use of DCFS's licensing authority to transfer its property to Smith raise more difficult issues. We again follow the two-part injury test outlined in *Parratt,* considering first whether the actions of which Easter House complains were taken under color of state law and second whether these actions deprived Easter House of constitutionally protected property interests without due process.

### A.

■ Easter House claims to have suffered losses due to actions undertaken by both Smith and the DCFS defendants. The

---

5. This court's May 4, 1978 order reinstated count one of Easter House's complaint but did not address the validity of count two. That order therefore has no relevance here.

6. The claim that defendants *conspired* to conduct an unwarranted investigation adds nothing

to Easter House's claim. "[I]t is the acts causing damage to the plaintiff that give rise to liability for damages, not the conspiracy itself." *Hostrop v. Board of Junior College Dist. No. 515,* 523 F.2d 569 (7th Cir.1975).

DCFS defendants handled the applications of Easter House and Easter House II in a way calculated to benefit Easter House II. Smith removed Easter House's files, and used its name in an effort to take the business of its clients. The actions taken by Felder, McGuire and Satoloe in processing the applications—the actions upon which both parties have focused on appeal —were clearly taken under color of state law. "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941), *quoted in Monroe v. Pape*, 365 U.S. 167, 184, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970).[7]

■ We also believe, although neither side addresses this point on appeal, that Smith's actions were taken under color of state law. The jury was instructed to consider Smith's removal of the files, use of Easter House's name and appropriation of Easter House's clients as possible deprivations of property under color of state law. Because these deprivations were part of the alleged conspiratorial plan and therefore lend support to the verdict against the DCFS defendants, we will discuss briefly their status as actions taken under color of state law.

In *Dennis v. Sparks*, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980), the Supreme Court held that "[p]rivate persons, jointly engaged with state officials ..., are acting 'under color' of law for purposes of 1983 actions." *Id.* at 27–28, 101 S.Ct. at

186–87 (citing *Adickes*, 398 U.S. at 152, 90 S.Ct. at 1605). *Dennis*, which involved allegations that private parties had bribed a judge to enjoin oil production from plaintiff's mineral lease, was recently reaffirmed in *Tower v. Glover*, 467 U.S. 914, 104 S.Ct. 2820, 81 L.Ed.2d 758 (1984). Defendants in *Tower* were public defenders whose normal duties have been held not to involve actions "under color of state law." *Tower* held that these defendants were nevertheless amenable to suit under section 1983 based on allegations that they had conspired with prosecutors and a judge to secure the plaintiff's wrongful conviction. *Id.* at 920, 104 S.Ct. at 2824; *see also Hudson v. Chicago Teachers Union Local No. 1*, 743 F.2d 1187, 1191 (7th Cir.1984) (union acts under color of state law when it combines with public employer to violate employees' first amendment rights), *aff'd*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986).[8] Based on these cases, we find that actions undertaken by Smith in furtherance of a conspiracy that relied critically on the defendants' abuse of their powers as officers of the state, were actions taken under color of state law.

**B.**

The jury instructions identified four forms of property that the jury could find Easter House had been deprived of without due process of law.

(1) Its child welfare agency license; (2) Records and files related to expectant mothers under its care, records and files relating to applicants and prospective adoptive parents, and ... records and files relating to various organizations in-

---

**7.** Conduct that qualifies as state action for purposes of the fourteenth amendment also qualifies as conduct "under color of state law," although the Court has indicated that some actions taken under color of state law may not constitute state action. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 & n. 18, 102 S.Ct. 2744, 2752 & n. 18, 73 L.Ed.2d 482 (1982).

**8.** Smith's acts would also appear to be attributable to the state defendants under the approach taken in *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). In *Blum*, the Court held that "a State normally can be held

responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, *either overt or covert*, that the choice must in law be deemed to be that of the State." *Id.* at 1004, 102 S.Ct. at 2786 (emphasis added); *see Kufalk v. Hart*, 610 F.Supp. 1178, 1184–85 (N.D.Ill.1985); *see also Baltz v. Shelley*, 661 F.Supp. 169, 175–76 (N.D. Ill.1987) ("encouragement or coercion" test of *Blum* and conspiracy approach of *Tower* interpreted as alternative routes to conclusion that psychiatrist assisting police acted under color of state law).

volved in the adoption field ... that may be a source for babies in need of adoption; (3) Reasonable expectations that Easter House's applicants or prospective adoptive parents may ... [obtain] a child from Easter House or have ... a home study [conducted] by Easter House; and (4) The legal right to the exclusive use of the name Easter House in connection with an adoption agency in Illinois.

Tr. at 1582–83 (June 17, 1986).

■ The parties' briefs and oral arguments on appeal have focused exclusively on Easter House's property interest in the renewal of its license. Property, for purposes of the due process clause of the fourteenth amendment, is "a legitimate claim of entitlement"; it is "defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Given the statutory and regulatory limitations on DCFS's authority to deny license renewals to child welfare agencies—*see* 1969 Ill. Laws 105–06 (current version at Ill.Rev.Stat. ch. 23, paras. 2218–2219 (1986))—Easter House plainly had a property interest in the renewal of its license. *See Reed v. Village of Shorewood*, 704 F.2d 943, 948–49 (7th Cir.1983); *Mirshak v. Joyce*, 652 F.Supp. 359, (N.D.Ill. 1987); *see also Barry v. Barchi*, 443 U.S. 55, 64 & n. 11, 99 S.Ct. 2642, 2649 n. 11, 61 L.Ed.2d 365 (1979) (horse trainer's license which can be suspended or terminated "only upon proof of certain contingencies" is a property interest). The restoration of Easter House's license within six weeks of the request that it be withheld does not undermine the assertion that a property interest was implicated; the duration of the deprivation of a protected interest may affect the adequacy of the process, but it does not change the nature of the interest at stake. *Reed*, 704 F.2d at 949.

The more difficult question here is whether Easter House was ever deprived of property by being prevented from operating. Agencies with renewal applications pending did not, apparently, need to have a current license in hand in order to operate.

Easter House's license expired on November 31, 1974; yet there is no indication that Easter House curtailed any aspect of its operations prior to Smith's departure at the end of December. Nor is there any indication that DCFS considered this interim operation improper. This practice was supported, even if not explicitly authorized, by section 9(b) of the Child Care Act, which allowed agencies to continue to operate pending judicial review of a DCFS decision to revoke or deny renewal of a license unless DCFS issued an order "directing that the operation of the facility terminate immediately." 1969 Ill. Laws 106 (current version at Ill.Rev.Stat. ch. 23, para. 2219(b) (1986)). If agencies could continue operations even after an administrative determination that they should not be relicensed, it would have been unreasonable to require them to cease operation while an administrative determination was pending.

The January 6th letter from Felder to Easter House could be interpreted as an order that Easter House cease operations under section 9(b). That letter informed the agency that before it could operate again, it would have "to make reapplication for license and to meet licensing standards for a child welfare agency." This interpretation is supported by DCFS's January 10th letter to Judge Comerford advising him that Easter House was no longer licensed and its statements to the prospective job applicant and the prospective adoptive parents who inquired about Easter House's status.

Defendants, however, contest this reading of the January 6th letter. They point out that Easter House did not receive the letter until January 21st (due to Smith's interference with Easter House's mail), when it also received the January 8th letter allowing it ten days to request a hearing before the denial of its application for renewal would become final. Easter House, in fact, initially requested a formal hearing, though it abandoned this request when Felder indicated that the license would be issued as soon as the Department had interviewed and approved the agency's new

social worker.[9] The January 8th letter could therefore be viewed as having restored Easter House to interim operating status—a status that, under the statute, DCFS could revoke only by holding a formal hearing, reaching a decision adverse to Easter House and either issuing an order requiring immediate termination of operations or obtaining a court order affirming its determination.

We find that the trial judge properly instructed the jury that, in the circumstances described here, Easter House's license represented a property interest. Although Easter House was *legally* entitled to conduct home studies and placements (once it had replaced Smith with another qualified social worker as required by section 5.10(D) of the DCFS regulations), the defendants, as revealed by their communications with Judge Comerford and interested members of the public, believed that Easter House was prohibited from operating. Even if the license remained technically valid, its practical value, the right to operate without legal and public opposition from the regulators, was gone. *See Reed*, 704 F.2d at 949.

Easter House's files and right to the exclusive use of its name, although ignored by the parties on appeal, are much more easily recognized as property interests rooted in Illinois law. Easter House's right to possession and use of its files was protected by Illinois' recognition of the common law tort of conversion, *see, e.g., In re Thebus*, 108 Ill.2d 255, 259–61, 91 Ill. Dec. 623, 625–26, 483 N.E.2d 1258, 1260–61 (1985) (describing elements of conversion claim), as well as by criminal penalties for theft, Ill.Rev.Stat. ch. 38, para. 16–1 (1986). Easter House's exclusive right to its name was protected by section 2 of Illinois' codification of the Uniform Deceptive Trade Practices Act, which makes it a deceptive trade practice to cause a "likelihood of confusion or of misunderstanding as to affiliation, connection or association with or certification by another." Ill.Rev.Stat. ch. 121½, para. 312(3) (1986); *see also* Ill.Rev. Stat. ch. 140, para. 22 (1986).[10] The property rights infringed by the conspiracy, therefore, were not limited to Easter House's interest in the renewal of its license.

### C.

Defendants also argue that Illinois law afforded Easter House adequate post-deprivation remedies for any deprivations it suffered and that under *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), these postdeprivation remedies provide all the process that was due. We do not believe that post-deprivation remedies under state law can cure deprivations of property brought about by a conspiracy involving high-level officials in a largely autonomous regional office to transfer the

---

9. Kurtz's hearing request was untimely under the Child Care Act, which provided ten days "dating from the postmark of the registered mail." 1969 Ill.Laws 105–06 (current version at Ill.Rev.Stat. ch. 23, para. 2219 (1986)). Section 5.02(B) of the DCFS regulations, however, provided ten days from receipt, making Kurtz's request appear timely. This discrepancy is academic in this case inasmuch as DCFS was clearly prepared to honor the January 22nd request for a hearing until Kurtz revoked the request on February 4th. Moreover, Easter House does not argue that it ceased operating because careful attention to the statute persuaded it that the nonrenewal *became final on January 18th.* (Such an argument would not be sustainable in any event since regulation 5.02(C) required DCFS to notify licensees by registered letter that the time for requesting a hearing had elapsed before treating them as unlicensed facilities.)

10. Defendants maintain that they should not be held accountable for the theft of the records or the misuse of the name "Easter House" because they did not believe they were authorized to withhold approval of Smith's charter or license application on the basis of these alleged instances of wrongdoing by Smith toward her former employer. *See* Tr. at 996 (June 11, 1986) (testimony of Thomas Felder concerning stolen files); Tr. at 1290 (June 16, 1986) (deposition testimony of Mary Lee Leahy, Director of DCFS, concerning reasons for overlooking the similarity of names). This evidence concerning defendants' motivations relates not to whether Easter House's property rights were violated, but to whether the violations were *attributable to* a conspiracy between Smith and the DCFS defendants. As we discuss below, the jury's finding that a conspiracy existed was amply supported by the evidence. *See infra* pages 920–21.

property of one licensee to another. We therefore reject defendants' *Parratt* argument.

*Parratt*, in which a prisoner sought damages under section 1983 for a hobby kit lost through the negligence of low-level prison officials, held that due process may be satisfied by postdeprivation remedies in state court, if the deprivation resulted from "a random and unauthorized act by a state employee." *Id.* at 541, 101 S.Ct. at 1916.[11] Later, the Court extended *Parratt*'s holding to intentional deprivations that are random and unauthorized from the perspective of the state. *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). *Hudson* found that the state could not practically provide predeprivation procedures to prevent a prison guard from deliberately destroying an inmate's property in violation of prison policies and that state tort remedies therefore satisfied the demands of due process.

The Supreme Court has not fully elaborated the "random and unauthorized" prerequisite to the application of *Parratt*. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436, 102 S.Ct. 1148, 1158, 71 L.Ed.2d 265 (1982), however, provides one illustration of a deprivation threat that cannot be classed as random and unauthorized and hence cannot be reconciled with the demands of due process through state tort remedies. Logan filed an employment discrimination claim that was nullified by the combined effect of "random" bureaucratic delay and a 120–day statutory deadline for administrative action. Although the state's delay in Logan's case was "random," Logan was deprived of his interest in a determination on the merits of his claim by operation of the established claims processing system. Because the deprivation was authorized, state tort law remedies against the allegedly discriminating employer did

not satisfy the demands of due process. *Id.* at 435–37, 102 S.Ct. at 1157–59; *see also Bennett v. Tucker*, 827 F.2d 63 (7th Cir.1987) (section 1983 available to plaintiff asserting due process right to notice and an opportunity for review when administrative agency terminates claim).

The circumstances of this case do not correspond closely to either the *Parratt–Hudson* line or to *Logan*. The defendants' actions were not unforeseeable transgressions of low-level officials (Felder, after all, was head of the Department's Central Office with authority to revoke or refuse to renew licenses of child welfare agencies), like the negligent acts of the prison guards in *Parratt*. Neither were they steps taken under a regular routine that systematically deprived claimants of property without a predeprivation hearing, like the claims process attacked in *Logan*. We are presented instead with an agreement involving three regulatory officials and a licensee, to use the authority of a state licensing agency to transfer property from one private citizen to another.

We find compelling reasons for distinguishing this case from *Parratt* and *Hudson*. These cases held that post-deprivation remedies under state law could avert a potential due process violation only if the deprivation resulted from "random and unauthorized acts." [12] In *Tavarez v. O'Malley*, 826 F.2d 671 (7th Cir.1987), this court recognized that a broad reading of *Parratt* would eliminate section 1983 as a remedy for virtually any property deprivation, since state tort remedies are generally available for property losses. Finding this result "unpalatable," we indicated that *Parratt* must be interpreted in light of various "limiting principles." *Id.* at 675; *see also Wilson v. Civil Town of Clayton*, 839 F.2d 375, 379–80 (7th Cir.1988). One

---

11. *Parratt*'s holding that negligent property deprivations could violate the due process clause has been overruled. *See Daniels v. Williams*, 474 U.S. 327, 330–31, 106 S.Ct. 662, 664–65, 88 L.Ed.2d 662 (1986).

12. *Logan*, which held *Parratt* inapplicable to deprivations that were "random" (in the sense that there was no rhyme or reason to the State's

choice of which claims it allowed to lapse) but "authorized" (in that established procedures allowed for the random nullification of lapsed claims) demonstrates that both characteristics must be present for a property deprivation to fall within the scope of *Parratt*. *See Wilson v. Civil Town of Clayton*, 839 F.2d 375, 382 (7th Cir.1988).

potential source of limitations on *Parratt,* that this court discussed in *Tavarez,* is the phrase "random and unauthorized act." This language could be read narrowly to refer only to situations in which "a predeprivation remedy is infeasible because the officials authorized to grant ... a hearing are unaware of the deprivation before it occurs" or broadly to refer to "any loss that 'is not a result of some established state procedure.'" *Tavarez,* 826 F.2d at 677 (quoting *Parratt,* 451 U.S. at 541, 101 S.Ct. at 1916).

■ We do not need to attempt a definitive interpretation of "random and unauthorized" for purposes of this case. We hold only that the phrase is at least narrow enough to exclude a conspiracy by high-level officials to use the licensing process to transfer property from one licensee to another from the class of due process violations that can be cured by state law remedies. We think *Tavarez* points us firmly in this direction. *See also Bretz v. Kelman,* 773 F.2d 1026, 1031 (9th Cir.1985) (*Parratt,* "in which the touchstone for predeprivation process is the feasibility of providing such process, is simply inapplicable where the alleged deprivation is inextricable from the alleged corruption of the process which the state ordinarily could provide.") (en banc); *Merritt v. Mackey,* 827 F.2d 1368, 1373 n. 4 (9th Cir.1987) (same); *Acorn Ponds v. Incorporated Village of North Hills,* 623 F.Supp. 688 (E.D.N.Y.1985) (alleged conspiracy involving building inspectors closer to *Logan* than to *Parratt*). The absence of statutory or regulatory authorization for the defendants' misuse of the regulatory process does not, in our view, establish that the conduct at issue was random and unauthorized. As *Tavarez* concludes, officials who are responsible for providing constitutionally adequate process "cannot escape liability under section 1983 simply by exceeding the scope of their authority." 826 F.2d at 677.

We are aware that there is some authority for an extremely broad reading of *Parratt* which we think would be quite at odds with the direction set by *Tavarez.* *See Holloway v. Walker,* 790 F.2d 1170 (5th Cir.) (*Parratt* applied to conspiracy between state court judges and private parties to deprive plaintiffs of property), *cert. denied,* 479 U.S. 984, 107 S.Ct. 571, 93 L.Ed.2d 576 (1986); *National Communication Sys., Inc. v. Michigan Pub. Serv. Comm'n,* 789 F.2d 370, 372–73 (6th Cir.) (*Parratt* " 'extend[s] at least to all section 1983 cases claiming a procedural due process injury to a property interest' " notwithstanding that the acts complained of were intentional or conspiratorial) (quoting *Vicory v. Walton,* 721 F.2d 1062 (6th Cir. 1983), *cert. denied,* 469 U.S. 834, 105 S.Ct. 125, 83 L.Ed.2d 67 (1984)), *cert. denied,* 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986).[13] We believe, however, that by following *Tavarez* and *Bretz* we are adopting a course which steers clear of the boundless expansion of *Parratt* that this court deemed "unpalatable" in *Tavarez.*[14]

## V.

Defendants contend that even if their actions did deprive Easter House of proper-

---

13. Appellants cite *Cameo Convalescent Center, Inc. v. Percy,* 800 F.2d 108 (7th Cir.1986), as authority for the application of *Parratt* to this case. *Cameo,* however, dealt with a deprivation that "the evidence show[ed] ... was random and unauthorized due to a clerical mistake." *Id.* at 111. *But see Cameo Convalescent Center v. Senn,* 738 F.2d 836, 841–43 (7th Cir.1984) (plaintiffs entitled to jury instruction on conspiracy theory). The jury in this case concluded, with ample evidentiary support, that the injuries of which Easter House complains were caused not by inadvertent error, but by a deliberate scheme to misuse the state's regulatory authority. *Cameo's* application of *Parratt* and *Hudson* therefore has no bearing here.

14. Even if we were to find that the conspiracy here constituted random and unauthorized behavior within the ambit of *Parratt,* it is not clear that Easter House's postdeprivation remedies were adequate. For Easter House, as for the plaintiff in *Logan,* "[s]eeking redress through a tort suit [would probably] be a lengthy and speculative process," *Logan,* 455 U.S. at 421–22, 102 S.Ct. at 1150–51; a process complicated by the "limited liability and extensive immunities of public officials to tort suits under Illinois law." *Tavarez,* 826 F.2d at 676. Moreover, state law protections that the defendants claim Easter House should have invoked to protect its name provided only for injunctive relief. *See* Ill.Rev.Stat. ch. 121½, para. 312(3) (1986); *id.* ch. 140, para. 22 (1986).

ty without due process, they were entitled to qualified immunity as a matter of law. We will first survey some of the general principles controlling qualified immunity before applying them to the defendants' claim.

### A.

In delineating the contours of the qualified immunity defense, the Supreme Court has sought to balance the rights of citizens, for whom "an action for damages may offer the only realistic avenue for vindication of constitutional guarantees," against the costs to society of involving public officials in unwarranted litigation. *See Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982). Prior to *Harlow*, the availability of qualified immunity depended both on the objective reasonableness of the challenged conduct and on the subjective good faith of the defendant official. *See Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975). *Harlow*, however, supplanted the *Wood* approach with an almost exclusively objective standard, which permits dismissal of suits against government officials on summary judgment if "their conduct does not violate clearly es-

tablished statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738.[15]

By adopting an objective standard the Court sought to reduce the burdens that section 1983 actions placed on government officials by allowing many of these claims to be dismissed at an early stage. The Court underscored its concern about these burdens in *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), which held that a district court's denial of a qualified immunity defense on summary judgment constituted an appealable "final decision" under 28 U.S.C. section 1291. Without an immediate right of appeal, the Court reasoned, a district court's erroneous rejection of a qualified immunity claim could deprive public officials of Harlow's protection against the burdens of unwarranted litigation. *Mitchell,* 472 U.S. at 526–27, 105 S.Ct. at 2815–16; *see also Whitt v. Smith*, 832 F.2d 451, 453 (7th Cir.1987).

The parties dispute the applicability of *Harlow* 's objective standard to a case in which the defense was unsuccessful in its efforts to invoke qualified immunity prior to trial.[16] We need not decide this issue

---

**15.** *Harlow* left open the possibility, however, that an official's subjective good faith might, under "extraordinary circumstances," immunize behavior that violated a clear rule of law. 457 U.S. at 818, 102 S.Ct. at 2738.

**16.** Easter House asserts that *Harlow* 's justification for excluding subjective factors from the qualified immunity test does not apply to defendants who are properly required to present a defense on the merits. *See McElveen v. County of Prince William*, 725 F.2d 954, 957–58 (4th Cir.1984). There is some force to the argument that courts should not be required to ignore evidence of subjective bad faith if defendants have failed to establish a qualified immunity defense on summary judgment—especially if the availability of immediate appeal under *Mitchell* reduces the chances of error at this stage. However, the interests of officials, and the public, in avoiding inquiries into subjective intent do not disappear entirely once a case goes to trial; the prospect that the court will consider subjective factors when evaluating a qualified immunity motion at the conclusion of the evidence may also make it more expensive, intrusive and time consuming to defend a section 1983 case. The argument for reintroducing sub-

jective matters must therefore be that the additional costs are outweighed (once the trial is a foregone conclusion) by the value of deterring officials and compensating plaintiffs in cases where defendants knew their actions were unlawful. We note, moreover, that the purely objective *Harlow* standard has been applied following trials on the merits by the Supreme Court and this circuit. *See Malley v. Briggs*, 475 U.S. 335, 345–46, 106 S.Ct. 1092, 1098, 89 L.Ed. 2d 271 (1986) (applying *Harlow* standard to qualified immunity defense raised in directed verdict motion after close of plaintiff's case); *Benson v. Allphin*, 786 F.2d 268, 272–76 & n. 19 (7th Cir.) (objective standard applied when immunity first raised in motion for judgment notwithstanding the verdict), *cert. denied*, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986); *see also Davis v. Scherer*, 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984) (qualified immunity defense depends upon the "objective reasonableness" of official conduct; "[n]o other circumstances are relevant to the issue"); *Azeez v. Fairman*, 795 F.2d 1296, 1301–02 (7th Cir.1986) (same). These decisions, however, have not expressly addressed the rationales that *McElveen* gives for considering subjective intent at trial.

here, however, because the district judge's rejection of the qualified immunity defense with respect to the first count was justified even under the purely objective test. Easter House's allegation that the defendants conspired with Smith to transfer control of Easter House via the licensing process stated a clear deprivation of Easter House's property without due process of law. The district judge therefore did not need to rely on evidence or inferences concerning the defendants' subjective beliefs to reject their qualified immunity claim.

The results of applying *Harlow*'s objective test depend critically on whether the rule at issue is stated in general or specific terms. The general proposition that government officials violate the constitution when they deprive citizens of property without due process is well known and uncontroversial; the specific procedural protections required by the due process clause in a particular situation are often open to dispute. The Supreme Court recently provided the following guidance on framing the right at issue in a section 1983 suit:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Anderson v. Creighton,* —— U.S. ——, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citation omitted); *see Mitchell,* 472 U.S. at 528, 105 S.Ct. at 2816. This court has addressed this problem on several occasions. *Compare Abel v. Miller,* 824 F.2d 1522 (7th Cir.1987) ("the rights asserted must be tailored to the factual circumstances in which the alleged violations occurred") and *Azeez v. Fairman,* 795 F.2d 1296, 1301 (7th Cir.1986) ("The right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful.") *with Little v.*

*Walker,* 552 F.2d 193, 197 (7th Cir.1977) (officials "cannot hide behind a claim that the particular factual predicate in question has never appeared *in haec verba* in a reported opinion"), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 530 (1978). Cases decided prior to the conduct for which a defendant seeks qualified immunity that assess the legality of closely analogous, though not necessarily identical, acts or omissions sometimes provide a measure of clearly applicable standards. *See, e.g., Abel,* 824 F.2d at 1533.

### B.

■ We turn now to defendants' claim that their actions during 1976 and 1977 were protected by qualified immunity because they could reasonably have believed they were affording Easter House due process. Here we encounter a problem of factual characterization, distinct from the problem of factual characterization just discussed. Defendants, ignoring the jury's finding that they conspired with Smith to transfer Easter House's clients, name and goodwill to Easter House II, focus narrowly on their own overt acts. They argue that none of their actions, viewed as isolated events, clearly violated Easter House's right to due process. If the issue were actually this narrow, defendants would be entitled to qualified immunity. In 1974, the demands of due process varied—as they do now—according to a situation-specific balancing of government interests in efficient decision making against private interests in avoiding erroneous deprivations. *Goldberg v. Kelly,* 397 U.S. 254, 262–63, 90 S.Ct. 1011, 1017–18, 25 L.Ed.2d 287 (1970); *Cafeteria & Restaurant Workers Union Local 473 v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1960). This court has held that "whenever a balancing of interests is required, the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability under ... *Harlow.*" *Benson,* 786 F.2d at 276.[17]

---

17. Easter House argues that there were two    clear principles in due process case law that

We do not think, however, that defendants' actions can be separated from the context in which the jury placed them. The jury found that the defendants participated in a conspiracy to misuse the licensing process in order to transfer Easter House's property to Smith. It is well established that otherwise lawful actions take on a different character when undertaken in connection with " 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means.' " *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir.1979) (quoting *Rotermund v. United States Steel Corp.*, 474 F.2d 1139, 1145 (8th Cir. 1973)), *rev'd in part on other grounds*, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980). In *Hobson v. Wilson*, 737 F.2d 1 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985), plaintiffs alleged that a conspiracy by FBI officials had deprived them of their first amendment rights to freedom of speech, assembly and association through domestic counterintelligence operations aimed at subverting cooperation among various factions of the "New Left." The *Hobson* court held that the FBI officials could not invoke qualified immunity.

> Whatever authority the Government may have to interfere with a group engaged in unlawful activity, and however it may be permitted to impede or deter rights of lawful association as a by-product of legitimate Government actions, it is *never* permissible to impede or deter lawful civil rights/political organization, expression or protest with no other direct purpose and no other immediate objective than to counter the influence of the target association.

*Id.* at 27;[18] *see also Simpson v. Weeks*, 570 F.2d 240, 242–43 (8th Cir.1978) (conspiracy claim does not create property interest where none previously existed, but can change interpretation given overt acts), *cert. denied*, 443 U.S. 911, 99 S.Ct. 3101, 61 L.Ed.2d 876 (1979).[19]

We believe that similar considerations defeat defendants' qualified immunity claims in this case. Whatever leeway the due

preempted a particularized balancing of interests and clearly established its right to a predeprivation hearing: (1) a requirement that predeprivation hearings be provided wherever feasible and (2) a requirement that states adhere to their own procedures. Neither of these propositions was (or is) as clear as Easter House contends. On the first, see *Goldberg v. Kelly*, which stated: "It is true, of course, that some governmental benefits may be administratively terminated without affording the recipient a pre-termination evidentiary hearing." 397 U.S. at 263, 90 S.Ct. at 1018; *see also Tavarez v. O'Malley*, 826 F.2d 671, 676 (7th Cir.1987) ("[W]e have declined to hold that a predeprivation hearing is always required if feasible, pointing out that the Supreme Court has not always insisted on a predeprivation hearing in such circumstances."). On the second, see *Davis v. Scherer*, which held that officials may still claim qualified immunity even if they violated a clear statute or regulation that advances an important interest or protects a constitutional right. 468 U.S. at 195, 104 S.Ct. at 3019; *see also Shango v. Jurich*, 681 F.2d 1091, 1097–98 (7th Cir.1982) ("Although the existence of a liberty or property interest may be ascertained by reference to state law, once such an interest is identified, the task of defining the procedural protections which attach to that interest is wholly a matter of federal constitutional law. . . . [S]tate procedural protections cannot define what process is due.").

18. *Hobson* was brought under the proscription against conspiracies to deny equal protection of the laws contained in the first clause of 42 U.S.C. § 1985(3). This provision does not require action under color of state law, but does require evidence of racial or class-based animus. *See Kush v. Rutledge*, 460 U.S. 719, 725–26, 103 S.Ct. 1483, 1487–88, 75 L.Ed.2d 413 (1983). The analysis of qualified immunity for government officials, however, is governed by *Harlow* and its progeny, whether the claim arises under 1985(3) or under 1983. *Hobson*, 737 F.2d at 24.

19. The courts of appeals for the Ninth and District of Columbia Circuits have confronted qualified immunity defenses in other contexts in which plaintiffs must prove unconstitutional motive to prevail. Both have determined that issues of unconstitutional motive require deviation from a purely objective approach to qualified immunity. *See Gutierrez v. Municipal Court*, 838 F.2d 1031, 1049–51 (9th Cir.1988) (intentional discrimination based on race); *Martin v. District of Columbia Metro. Police Dep't*, 812 F.2d 1425, 1431–33 (D.C.Cir.) (malicious prosecution), *decision vacated in part and scheduled for rehearing en banc*, 817 F.2d 144 (D.C.Cir.), *decision to rehear en banc rev'd and panel opinion reinstated sub nom. Bartlett ex rel. Neuman v. Bowen*, 824 F.2d 1240 (D.C.Cir.1987).

process clause may have afforded defendants to delay Easter House's license or to issue Smith's license without subjecting her applications to the normal level of scrutiny, it did not permit defendants to use the licensing process in furtherance of a scheme to transfer one licensee's business to another licensee. Authoritative caselaw has long guaranteed an impartial adjudicator in litigation involving protected liberty or property interests. *See, e.g., Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 820, 106 S.Ct. 1580, 1584, 89 L.Ed.2d 823 (1986); *Ward v. Village of Monroeville,* 409 U.S. 57, 60–61, 93 S.Ct. 80, 83–84, 34 L.Ed.2d 267 (1972); *Tumey v. Ohio,* 273 U.S. 510, 535, 47 S.Ct. 437, 445, 71 L.Ed. 749 (1927); see also *Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980) (owners of oil production rights liable for violating due process rights of neighboring leaseholder by conspiring with state judge to enjoin production from mineral leases). Moreover, the extension of this guarantee to administrative adjudications is neither a recent nor a tentative development. *See Gibson v. Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 1698, 36 L.Ed.2d 488 (1973). There was no evidence that the state defendants in this case anticipated any direct financial gain from the conspiracy, though co-conspirator Smith's financial stake was obvious. We do not think, however, that this detracts significantly from the clarity of plaintiff's due process right. The mayor who imposed traffic fines in *Ward* did not need to have a direct monetary interest to be disqualified, only an interest in the town's finances. *See also In Re Murchison,* 349 U.S. 133, 136–39, 75 S.Ct. 623, 625–26, 99 L.Ed. 942 (1955) (due process will not permit judge who serves as one-man grand jury to hear trial of defendant accused of perjury before grand jury); *Tumey,* 273 U.S. at 534, 47 S.Ct. at 445 ("A situation in which an official perforce occupies two practically and seriously inconsist-

ent positions, one partisan and the other judicial, necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him.").[20] Moreover, quite apart from any question of direct or indirect gain, we do not think that any reasonable official could have believed that the law of due process, as it stood in late 1974, permitted licensing decisions to be made by officials engaged in a conspiracy to transfer property from one licensee to another.

■ In endorsing the proposition that a conspiracy claim may affect the legal significance of officials' overt acts, we do not believe that we are offering plaintiffs a means of frustrating the Supreme Court's efforts to reduce the social costs of meritless claims against government officials. Conspiracy allegations, it is true, unavoidably raise questions of motive and intent. Thus, when plaintiffs allege that government officials participated in a conspiracy to use otherwise legal actions to pursue illegal aims, the availability of summary dismissal will unavoidably depend on the kind of inquiry into subjective factors that *Harlow* sought to minimize.

This tension between *Harlow*'s aim to establish an objective standard for qualified immunity and the centrality of motivation to conspiracy claims would be troubling if it were not for two important limits on conspiracy claims. This circuit has recognized the danger of litigants' adducing unfounded conspiracy allegations in order to block summary judgment against weak claims. Plaintiffs must therefore plead specific facts tending to show that a conspiracy existed to survive a summary judgment motion; conclusory allegations will not suffice. *See, e.g., Rodgers v. Lincoln Towing Serv., Inc.,* 771 F.2d 194, 201 (7th Cir.1985); *Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1352 (7th Cir. 1985); *Goldschmidt v. Patchett,* 686 F.2d

---

**20.** While the Supreme Court has not made pecuniary interest a necessary element of a claim of bias in violation of due process, it has stated that "matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters of legislative discretion." *Tumey,* 273 U.S. at 523, 47 S.Ct. at 441; *see*

*Aetna Life Ins.,* 475 U.S. at 820, 106 S.Ct. at 1584. We believe that the jury's finding of an agreement between defendants and Smith to misuse DCFS's licensing authority plainly distinguishes the issue in this case from the matters of judgment and appearances of fairness that the Court left to the legislature in *Tumey.*

582, 585 (7th Cir.1982); *see also Hobson,* 737 F.2d at 29–31 (imposing strict pleading requirements for allegations of "unconstitutional motive"). In addition, we note that a conspiracy allegation does not dispense with the need to identify a right that was violated. Section 1983 authorizes recovery for conspiracy to violate a clearly established right, not for the conspiracy itself. *Hostrop v. Board of Jr. College Dist. No. 515,* 523 F.2d 569, 576 (7th Cir. 1975). The Supreme Court has adopted a " 'functional' approach to immunity questions other than those that have been decided by express constitutional or statutory enactment," an approach under which "[o]fficials who seek exemption from personal liability have the burden of showing that such an exemption is justified by overriding considerations of public policy." *Forrester v. White,* —— U.S. ——, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988). In view of the checks on unfounded conspiracy claims, we do not believe that the Court's functional approach can support an extension of *Harlow* to preclude consideration of a well pleaded conspiracy claim when assessing whether government officials have violated plaintiffs' rights.

## VI.

■ Defendants attack the jury's determination that they conspired with Smith to deprive Easter House of property on two fronts. First, they contend that the district judge based his conspiracy instruction on

the law of criminal conspiracy. A criminal conspiracy, according to the defendants, can be found to exist based on less compelling evidence of wrongdoing by the conspirators than can a civil conspiracy. Defendants cite no authority for the purported distinction. Moreover, most of the district court's conspiracy instructions were taken virtually verbatim from two decisions of this court in civil cases involving conspiracies to violate rights protected by section 1983.[21] *Compare Bell v. City of Milwaukee,* 746 F.2d 1205, 1255–57 (7th Cir.1984) and *Hampton v. Hanrahan,* 600 F.2d 600, 620–21 (7th Cir.1979) *with* Tr. at 1585–88 (June 17, 1986).[22] We conclude that the conspiracy instructions, considered "as a whole, in a common sense manner, avoiding fastidiousness, [and] inquiring whether the correct message was conveyed to the jury reasonably well," were more than adequate. *Wilk v. American Medical Ass'n,* 719 F.2d 207, 218–19 (7th Cir.1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984).

■ Defendants also contend that the conspiracy finding lacked sufficient support in the evidence presented at trial and that the district court erred in denying their motions for directed verdict and judgment notwithstanding the verdict on this point. A district court's denial of a directed verdict or judgment n.o.v. will be overturned only if the evidence, taken as a whole and viewed in the light most favor-

---

**21.** Defendants take particular exception to one passage of the instructions that did not appear in *Hampton* or *Bell.* The judge stated that a conspirator could be implicated by actions as facially innocent as "walking across the street, or driving an automobile, or using the telephone." Tr. at 1587–88 (June 17, 1986). Defendants argue that this instruction "effectively foreclosed the jury" from finding that Smith acted alone. This argument ignores the district judge's repeated references to the requirement that conspirators reach a "meeting of the minds" as to the objectives of the conspiracy. When officials misuse regulatory authority in pursuit of a conspiracy to violate rights protected by section 1983, their actions are no more protected from scrutiny than are the facially innocent actions of private conspirators. *See Cameo Convalescent Center, Inc. v. Senn,* 738 F.2d 836, 841–43 (7th Cir.1984) (plaintiffs entitled to a conspiracy instruction based on evi-

dence that regulatory sanctions were misused to deprive regulated entity of protected property interest), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 780, 83 L.Ed.2d 775 (1985).

**22.** The defendants, who are presumably aware that *Hampton* and *Bell* were civil suits, may have intended to distinguish between section 1983 conspiracies that could also subject the conspirators to criminal liability and section 1983 conspiracies that do not provide a basis for criminal prosecution. This position too is unsupported by our cases. Neither *Hampton* nor *Bell* comments on the possible criminality of the conspirators' actions. Moreover, *Cameo Convalescent Center,* 738 F.2d 836, applies the *Hampton* standard to an alleged conspiracy that seems at least as unlikely to give rise to criminal liability as the actions alleged by Easter House.

able to the nonmoving party, leads to the conclusion that no reasonable jury could hold for the nonmoving party. *E.g., Crawford v. Edmonson*, 764 F.2d 479 (7th Cir. 1985). The evidence recited at the outset of this decision easily meets this standard. Easter House's evidence, if believed, showed that defendants, after learning of Smith's plan to leave Easter House taking its files, mail and telephone service, disregarded statutory standards, regulatory requirements and their own internal guidelines in order to delay Easter House's license. Members of the public who inquired about Easter House were given a negative assessment of the agency's standing. Simultaneously, Easter House II's charter and license applications were given rapid and favorable consideration despite abundant evidence of serious wrongdoing by Smith. The charter study referred to interviews with people who denied having been contacted. The license study was prepared well over one month after the defendants transmitted their approval to Springfield.

Defendants did present evidence tending to undermine the conspiracy claim. They attempted to explain their actions toward Easter House and Easter House II as products of unrelated, good faith judgments on the merits of the agencies' applications. They also adduced evidence that they had attempted to prevent Smith's wrongdoing insofar as they believed that it was within their authority to do so. Taken as a whole, however, this evidence was not so compelling as to force any reasonable jury to reject Easter House's conspiracy claim. The motions for directed verdict and judgment n.o.v. were properly denied.

## VII.

Defendants' final argument concerns the jury's award of $150,000 in compensatory damages for the effects of the 1974–1975 conspiracy on Easter House's business. At trial, Easter House argued that the conspiracy's direct interference with its business, along with the public confusion and misconceptions that it caused, depressed Easter House's revenues for the years 1975, 1976 and 1977. Easter House estimated the effect on its gross revenues by calculating the difference between its actual revenues and the revenues it would have obtained if its business had followed a linear growth path from 1974 through 1978—the path Easter House claims its revenues would have followed had it not been for the conspiracy. Actual gross revenues fell short of these projections by $216,000. Easter House then reduced this figure by thirty percent, its estimate of the variable costs that the additional business would have entailed, to obtain lost net revenues of approximately $150,000—the amount the jury awarded.

Defendants argue that the district court erred in permitting the plaintiff to go to the jury on a damage claim based on gross revenues. This argument is unsupported by the record; it ignores the plaintiff's thirty percent adjustment to gross revenues and the district judge's instruction to the jury that compensatory damages should include "the loss of gross revenue minus certain expenses, [or] net revenue, which [Easter House] would have realized but for the wrongful conduct of defendants." Tr. 1589 (June 17, 1986).

▆▆▆ Defendants' real objection seems to be that Easter House's approach overstated actual damages and that the award was therefore excessive. This objection, which goes to the sufficiency of Easter House's evidence on damages, should have been presented to the jury. At trial, defendants mounted only a cursory attack on Easter House's methodology and presented no alternative estimates. We will not correct now for the defendants' omissions or miscalculations at trial. *See Empire Gas Corp. v. American Bakeries Co.*, 840 F.2d 1333, 1342 (7th Cir.1988). Defendants have simply failed to put evidence into the record which would satisfy the "severe" test applicable to claims that damages are excessive. *See Webb v. City of Chester*, 813 F.2d 824, 836 (7th Cir.1987); *Joan v. City of Chicago*, 771 F.2d 1020, 1023 (7th Cir.1985); *see also Patton v. Mid-Continent Sys., Inc.*, 841 F.2d 742, 748 (7th Cir.1988) (assessing whether damages "so

excessive in relation to the proof of harm that verdict should be set aside"). We therefore reject defendants' attack on the amount of the damages assessed on count one.

## VIII.

This case presents a troubling and, we hope, atypical picture of the abuse of state regulatory authority. The picture would be more disturbing if we lent credence to the defendants' repeated assertions that a victory for Easter House will discourage regulators from making the decisions that their jobs, and the public interest, require.

We see the result here in much narrower and more beneficial terms. Easter House filed a complaint adducing specific factual allegations in support of its claim that state officials had conspired with a private citizen to deprive it of its property. The district court properly rejected defendants' arguments that the actions of the conspirators violated no clear constitutional norm and that the plaintiffs were restricted to their remedies under state law. The plaintiff then convinced the jury, based on a compelling, if not entirely one-sided, presentation of facts that the defendants had indeed conspired to use the state regulatory authority to take its property. The allegations pleaded and proved here are far removed from the legitimate exercise of discretion by responsible state officials. The judgment of the district court is

AFFIRMED IN PART AND REVERSED IN PART.

KANNE, Circuit Judge, dissenting in part and concurring in part:

In my view, Easter House is not entitled to recovery under § 1983 for the deprivation of its operating license. The tortious act of the state employees underlying this deprivation of property was both random and unauthorized—and meaningful post-deprivation remedies of injunctive relief and damages were available in state court. Therefore, there was no violation of the Fourteenth Amendment and I respectfully dissent from the majority's opinion affirming the jury verdict in Count I.

The Supreme Court, in *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), held that a random and unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available. *Hudson* explicitly limits the use of intentional torts as a basis for a § 1983 claim if the action of the state tortfeasors was random and unauthorized. *Hudson's* extension of § 1983 limitations followed the Court's decision in *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).

To avoid what it perceives as an unpalatable expansion of *Parratt/Hudson*, the majority holds (at page 915) that when high-level state officials conspire to unlawfully misuse established procedures to deprive a citizen of his property rights—such action can never be "random and unauthorized." By such a sweeping and questionable generalization, the majority imposes an unwarranted restriction on the *Parratt/Hudson* doctrine—and, correspondingly, broadens the scope of § 1983 in actions against state employees founded on intentional torts relating to property.

The majority attempts to circumvent the *Parratt/Hudson* limitation on § 1983 actions by relying on the rationale of the Ninth Circuit's opinion in *Bretz v. Kelman*, 773 F.2d 1026 (9th Cir.1985). *Bretz* held that a conspiracy, by definition, could not be random and further purported to confine *Parratt* to relatively minor deprivations of property by low-level officials.

The *Bretz* case was emphatically rejected by the Fifth Circuit in *Holloway v. Walker*, 790 F.2d 1170 (5th Cir.), *cert. denied*, 479 U.S. 984, 107 S.Ct. 571, 93 L.Ed.2d 576 (1986); *see also Schaper v. City of Huntsville*, 813 F.2d 709, 715 (5th Cir.1987). The *Holloway* court found the reasoning of the Ninth Circuit to be unpersuasive. Likewise, I find the rationale in *Bretz* unpersuasive and its application here is unavailing. I do not believe, as the majority does, that the definition of "random and unauthorized" conduct by state employees is so

narrow as to "exclude a conspiracy by high-level officials." As the *Holloway* court stated:

> The Ninth Circuit's conclusion that a conspiracy cannot be a random act is also unpersuasive. From the point of view of the state a conspiracy among its employees can indeed be a random act if the state cannot anticipate or control such conduct in advance. *See Hudson v. Palmer*, 468 U.S. 517 [532], 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984). Of course, a conspiracy is not random from the point of view of the conspirators but this is to say no more than that a conspiracy is an intentional act, rather than a negligent one. The effect of the Ninth Circuit's holding is to revive the intentional/negligent act distinction, rejected in *Hudson*, in another form.

*Holloway*, 790 F.2d at 1172.

Moreover, the fact that the conspiracy involved one or more "high-level officials" did not, in the view of the *Holloway* court, change the applicability of the *Parratt/Hudson* limitations. When state administrative procedures provide due process but are violated by a random and unauthorized act of even a high-ranking state employee, "*Parratt/Hudson* establishes that no federal constitutional due process violation has occurred." *Id.* at 1173.

In fact, the case before us is plainly subject to the limitation imposed by *Parratt/Hudson*. The record discloses absolutely no indication that the conduct of the state employees represents any more than a single, random, and unauthorized act. The act of conspiracy was random as to the agency's employees and was limited solely to the license of Easter House among the many other licenses issued by the agency. The act was also unauthorized since it clearly violated agency procedures. Under these facts, the state could not reasonably anticipate the wrongful conduct of its employees and no appropriate predeprivation remedy could have been fashioned.

Having disposed of the random and unauthorized limitation in an effort to bring Count I within the ambit of § 1983, the majority gives only brief mention to the assumed inadequacy of post-deprivation remedies. In footnote 14, the remedy of a state law tort suit is characterized as " 'a lengthy and speculative process' ... complicated by the 'limited liability and extensive immunities of public officials to tort suits under Illinois law.' " (citations omitted). With regard to specific remedies, the majority further comments that the defendants claimed only that Easter House could have sought injunctive relief, citing Ill.Rev. Stat. ch. 121½, ¶ 312(3) (1986); *id.* ch. 140, ¶ 22 (1986).

However, I am unconvinced that the Illinois courts could not have provided meaningful post-deprivation remedies to Easter House. The majority's footnote 14 reference seems to indicate that any meaningful remedy available to Easter House would have been limited to injunctive relief. However, it appears to me that Illinois law offered a meaningful avenue for making Easter House whole. For example, Ill.Rev. Stat. ch. 121½, ¶ 313, provides for injunctive relief in deceptive trade practice cases and states that such injunctive relief "is *in addition to remedies otherwise available* against the same conduct under the common law and other statutes of this state." (emphasis added). Illinois law provides a former employer with a remedy against a former employee who solicits key clients and improperly exploits benefits gained by his or her prior employment. *Smith–Shrader Co. v. Smith*, 136 Ill.App.3d 571, 91 Ill.Dec. 1, 5–6, 483 N.E.2d 283 (1985). Also, Illinois law affords a remedy to an individual whose contractual relations are subjected to interference at the hands of a third party. *Williams v. Weaver*, 145 Ill. App.3d 562, 99 Ill.Dec. 412, 417, 495 N.E.2d 1147 (1986); *Galinski v. Kessler*, 134 Ill. App.3d 602, 89 Ill.Dec. 433, 437, 480 N.E.2d 1176 (1985).

My reading of the Illinois law with regard to the immunity of public officials also is at odds with the characterization of the "extensive immunities of public officials" expressed by the majority. While Ill.Rev.Stat. ch. 127, ¶ 801 prohibits suits against the State of Illinois (unless they are

**924**

brought in the Illinois Court of Claims—Ill. Rev.Stat. ch. 37, ¶ 439.8), the Illinois Supreme Court has held that state employees are not granted immunity similar to that enjoyed by the state. *Senn Park Nursing Center v. Miller,* 104 Ill.2d 169, 83 Ill.Dec. 609, 618, 470 N.E.2d 1029 (1984); *see also Smith v. Jones,* 113 Ill.2d 126, 100 Ill.Dec. 560, 562, 497 N.E.2d 738, 740 (1986) ("An action against a state official for conduct in his official capacity will withstand a motion to dismiss the complaint on sovereign immunity grounds if the complaint alleges that the official is ... violating a law of Illinois and thus acting beyond his authority.").

The characterization of Illinois state court remedies as a "lengthy and speculative process" has no bearing on the constitutional adequacy of a post-deprivation remedy. Almost any court action (including the § 1983 action below) is capable of being described as a "lengthy and speculative process." Moreover, the fact that state procedures do not afford relief identical to that sought under § 1983 does not make those state procedures constitutionally inadequate. *Parratt,* 451 U.S. at 544, 101 S.Ct. at 1917; *Hudson,* 468 U.S. at 535, 104 S.Ct. at 3204.

Finally, the majority expresses a concern that the unrestricted application of *Parratt* would eliminate § 1983 as a remedy for virtually any property deprivation since state tort remedies are generally available for property loss. This court expressed such reservations in *Tavarez v. O'Malley,* 826 F.2d 671 (7th Cir.1987), and also in *Wilson v. Civil Town of Clayton,* 839 F.2d 375 (7th Cir.1988). However, the corollary of the *Parratt/Hudson* doctrine should allay such fears. The key is the proper analysis of "random and unauthorized." If the acts of state employees are *not* random or *are* authorized the avenue is open for pursuit of claims under § 1983 alleging deprivation of property without due process.

Based on the facts presented here and the availability of meaningful Illinois remedies, I believe that the analysis by the majority is defective. A reversal in this case would not expand the *Parratt/Hudson* limitation, but would merely represent an appropriate application of that limitation to § 1983 actions based on intentional torts. The tortious act by state employees could not be anticipated or controlled in advance. After the tortious act was committed, Easter House had a range of meaningful state remedies available to it. It was not denied due process. The Fourteenth Amendment was not violated and § 1983 is not applicable here. For the foregoing reasons I would reverse the decision of the district court with regard to Count I.

I concur with the reversal of Count II on the grounds that the investigation infringed no protected property interest.